IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

GENERAL ELECTRIC COMPANY,      )

                     )

        Plaintiff,      )    Civ. No. 1:00CV02855

                     )    (JDB)

                     )

     v.             )

                     )

STEPHEN L. JOHNSON, Administrator,   )

United States Environmental Protection Agency,  )

and the UNITED STATES ENVIRONMENTAL  )

PROTECTION AGENCY,     )

                     )

      Defendants.    )

_____)


**GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

Brackett B. Denniston, III
Thomas H. Hill
Jonathan M. Goodman
GENERAL ELECTRIC COMPANY
3135 Easton Turnpike
Fairfield, CT  06431
(203) 373-2492

Carter G. Phillips (Bar No. 264176)
Angus Macbeth (Bar No. 353953)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Voice: (202) 736-8000

Donald W. Fowler (Bar No. 381172)
Eric G. Lasker (Bar No. 430180)
SPRIGGS & HOLLINGSWORTH
1350 I Street, Ninth Floor
Washington, DC  20005-3305
(202) 898-5800

Laurence H. Tribe
420 Hauser Hall
1575 Massachusetts Ave.
Cambridge, MA  02138
Voice: (617) 495-4621

COUNSEL FOR PLAINTIFF GENERAL
ELECTRIC COMPANY

Dated:  December 7, 2007

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................. 1

SUMMARY OF ARGUMENT ........................................................................... 1

    A.    EPA's Pattern and Practice in the Issuance of UAOs Violates PRPs' Due Process Rights Under *Mathews v. Eldridge* ................................................. 2

    B.    EPA's Pattern and Practice in the Issuance of UAOs Violates PRP's Due Process Rights Under *Ex parte Young* .................................................. 6

STATEMENT OF THE CASE ............................................................................ 8

    A.    Statutory Background ........................................................................... 8

    B.    Prior Proceedings in the Case ............................................................... 9

ARGUMENT ................................................................................................. 10

I.    EPA's Pattern and Practice in Exercising its UAO Authority Violates PRPs' Constitutional Right to Due Process under *Mathews v. Eldridge* ............... 11

    A.    The Issuance of a UAO Imposes an Immediate Deprivation of Property and Liberty .......................................................................................... 12

        1.    A Decision Not to Comply with a UAO Has An Immediate Adverse Impact on a PRP's Market Value and Cost of Financing. ........................ 13

        2.    A Decision Not to Comply with a UAO Has an Immediate Adverse Impact on the Value of a PRP's Brand. ................................................... 18

        3.    A UAO Requires An Immediate Expenditure of Resources by a PRP Before It Can Decide Whether to Comply ............................................... 23

    B.    A Balancing of Government Interest, Private Interest, and Risk of Error Compels the Finding that PRPs Are Entitled to a Meaningful Hearing Before a UAO Becomes Effective ...................................................................... 26

        1.    EPA Cannot Point to Any Credible Government Interest in Depriving PRPs of Pre-Deprivation Hearings. ....................................................... 26

            a.    EPA Does Not Use UAOs to Address Environmental Emergencies. ............................................................................... 28

b.      EPA's Actual Purpose in Using UAOs Rather than Other Cleanup Options Is to Avoid Judicial Review and Coerce PRPs Into Accepting EPA's Terms for Settlement........................33

c.      A Hearing Would Not Unduly Delay Superfund Cleanups...........37

2.      PRPs Have a Significant Private Interest in Securing a Pre-Deprivation Hearing................................................................................38

3.      A Pre-Deprivation Hearing Would Ameliorate a Significant Risk of Error. ...................................................................................................42

C.      Due Process Thus Requires the Right to a Hearing Before UAOs Can Take Effect ................................................................................................48

II.     **EPA's Pattern and Practice in Exercise of its UAO Authority Also Violates PRPs' Constitutional Right to Due Process under *Ex parte Young***............................49

A.      EPA's Pattern and Practice of Issuing UAOs Is Unconstitutionally Coercive.......51

B.      EPA's Pattern and Practice Renders the Sufficient Cause Defense Constitutionally Inadequate Because It Denies PRPs Any Guidance as to the Meaning of the Defense. ........................................................................................54

C.      EPA's Pattern and Practice Deprives PRPs of any Credible Choice of Saying "No" to a UAO..........................................................................................58

**CONCLUSION** .............................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107 (9th Cir. 1988) .....................................31

*Acme Printing Ink Co. v. Menard, Inc.*, 812 F. Supp. 1498 (E.D. Wis. 1992) .............................32

*Aminoil, Inc. v. EPA*, 599 F. Supp. 69 (C.D. Cal. 1984) ................................................................53

*Aminoil, Inc. v. United States*, 646 F. Supp. 294 (C.D. Cal. 1986) ...............................................27

*Ark. Power & Light Co. v. Fed. Power Comm'n*, 156 F.2d 821 (D.C. Cir. 1946), *rev'd on other grounds,* 330 U.S. 802 (1947) ...................................................................................58

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ...................................................................................49

*Atl. Research Corp. v. United States*, 459 F.3d 827 (8th Cir. 2006), *aff'd*, 127 S. Ct. 2331 (2007) ......................................................................................................................................36

*Baldwin v. Hale*, 1 Wall 223, 233, 68 U.S. 223 (1863) ................................................................49

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) .........................................................................21, 27

*BE&K Constr. Co. v. NLRB*, 536 U.S. 516 (2002) .......................................................................59

*Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115 (2d Cir. 1975) .........................50

*Calero-Toledo*, 416 U.S. 663 (1974) ......................................................................................27, 33

*Carey v. Piphus*, 453 U.S. 247 (1978) ..........................................................................................48

*Chicago & N.W. Ry. v. Nye-Schneider-Fowler Co.*, 260 U.S. 35 (1922). ....................................59

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ...................................................10, 48

*Connecticut v. Doehr*, 501 U.S. 1 (1991). .......................................................................17, 42, 43

*Conset Corp. v. Cmty. Servs. Admin.*, 655 F.2d 1291 (D.C. Cir. 1981) .......................................22

*Contreras-Aragon v. INS*, 852 F.2d 1088 (9th Cir. 1988) ............................................................25

*Dixon v. Alabama Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961)......................................................26

*Doe v. U.S. Dep't of Justice*, 753 F.2d 1092 (D.C. Cir. 1985) .....................................................22

*Ex parte Young*, 209 U.S. 123 (1908) ............................................................................... passim

*Faheem-El v. Klincar*, 841 F.2d 712 (7th Cir. 1988)......................................................51

*Foster v. United States*, 922 F. Supp. 642 (D.D.C. 1996) ............................................32

*Friends of the Earth v. Reilly*, 966 F.2d 690 (D.C. Cir. 1992) ....................................10

*Fuentes v. Shevin*, 407 U.S. 67 (1972).............................................................17, 43, 49

*Gen. Elec. Co. v. EPA*, 360 F.3d 188 (D.C. Cir. 2004) ..................................................9

*Gen. Elec. Co. v. Johnson*, 362 F. Supp. 2d 327 (D.D.C. 2005) ........................... passim

*Gen. Elec. Co. v. Johnson*, No. Civ.A.00-2855, 2006 WL 2616187 (D.D.C. Sept. 12, 2006) ................................................................................................................10

*Gen. Elec. Co. v. Johnson*, No. Civ.A.00-2855, 2007 WL 433095 (D.D.C. Feb. 5, 2007)...........10

*George Washington Univ. v. District of Columbia*, 148 F. Supp.2d 15 (D.D.C. 2001) ...............26

*Gray Panthers v. Schweiker*, 652 F.2d 146 (D.C. Cir. 1980). ......................................10

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) .....................................................................49

*Hannah v. Larche*, 363 U.S. 420 (1960).......................................................................10

*Hodel v. Virginia Surface Mining*, 452 U.S. 264 (1981). .........................................24, 25

*Int'l Union, UAW v. OSHA*, 938 F.2d 1310 (D.C. Cir. 1991) ....................................46

*La. Pac. Corp. v. Beazer Materials Servs., Inc.*, 842 F. Supp. 1243 (E.D. Cal. 1994)..................25

*Leslie v. Lacy*, 91 F. Supp.2d 1182 (S.D. Ohio 2000) ..................................................18

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ................................................10

*Londoner v. Denver*, 210 U.S. 373 (1908).....................................................................10

*Mathews v. Eldridge*, 424 U.S. 319 (1976)........................................................... passim

*Medimmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007) ...................................50, 59

*Meghrig v. KFC W., Inc.*, 516 U.S. 479 (1996) ..........................................................32

*Mitchell v. W.T Grant Co.*, 416 U.S. 600 (1974).....................................................39, 42

*Mo. Pac. Ry. Co. v. Nebraska*, 217 U.S. 196 (1910) ...................................................55

*Mosrie v. Barry*, 718 F.2d 1151 (D.C. Cir. 1983)........................................................22

*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001).................22

*North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975) ....................................17, 43

*Okla. Operating Co. v. Love*, 252 U.S. 331, 336-37 (1920) ............................................................58

*Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953 (D.C. Cir. 1980) ..........................................................................................................................21, 22, 23

*Orange v. District of Columbia*, 59 F.3d 1267 (D.C. Cir. 1995)....................................................22

*Outboard Marine Corp. v. Thomas*, 773 F.2d 883, (7th Cir. 1985), *vacated on other grounds*, 479 U.S. 1002 (1986)...........................................................................................31

*Pactiv Corp. v. Chester*, 455 F. Supp. 2d 680 (E.D. Mich. 2006) ...........................................25, 53

*Pearson v. Shalala*, 164 F.3d 650 (D.C. Cir. 1999)......................................................................56

*Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127 (3d Cir. 2000) ................................55

*Price v. U.S. Navy*, 818 F. Supp. 1323 (S.D. Cal. 1992) ...............................................................32

*Raytheon Aircraft Co. v. United* States, 501 F. Supp. 2d 1323 (D. Kan. 2007) ...........................12

*Reardon v. United States*, 947 F.2d 1509 (1st Cir. 1991) (en banc).......................................17, 38

*Simmons v. United States*, 390 U.S. 377 (1968) ..........................................................................25

*Sniadach v. Family Fin. Corp.*, 395 U.S. 337 (1969) ...............................................................17, 43

*Solid State Circuits, Inc. v. EPA*, 812 F.2d 383 (8th Cir. 1987) ..............................................55, 57

*Taylor v. Resolution Trust Corp.*, 56 F.3d 1497 (D.C. Cir. 1995)....................................................23

*Tenn. Valley Auth. v. Whitman*, 336 F.3d 1236 (11th Cir. 2003) ...................................................32

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003) ...........................................22

*United States v. Fairchild Indus., Inc.*, 766 F. Supp. 405 (D. Md. 1991).....................................32

*United States v. Fla. East Coast Ry.*, 410 U.S. 224 (1973) ...........................................................10

*United States v. Hardage*, 663 F. Supp. 1280 (W.D. Okla. 1987)................................................33

*United States v. Hardage*, 750 F. Supp. 1460 (W.D. Okla. 1990), *aff'd in part, rev'd in part on other grounds*, 982 F.2d 1436 (10th Cir. 1992) ..........................................34

*United States v. Jackson*, 390 U.S. 570 (1968).............................................................................25

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993). ............................10, 43, 48

*United States v. Ne. Pharm. & Chem. Co.*, 579 F. Supp. 823 (W.D. Mo. 1984) *aff'd in part, denied in part on other grounds*, 810 F.2d 726 (8th Cir. 1986)......................................32

*United States v. Ottati & Goss, Inc.,* 900 F.2d 429 (1st Cir. 1990) ............................34, 43, 46, 48

*United States v. Philip Morris Inc.,* 314 F.3d 612 (D.C. Cir. 2003).............................................58

*United States v. Wade*, 546 F. Supp. 785 (E.D. Pa. 1982)............................................................31

*United States v. Wedzeb Enters.*, 844 F. Supp. 1328 (S.D. Ind. 1994) .........................................47

*Wagner Seed Co. v. Daggett*, 800 F.2d 310 (2d Cir. 1986) ......................................................... 27

**Statutes**

42 U.S.C. § 9605(a)(8).................................................................................................................. 28

42 U.S.C. § 9606........................................................................................................................... 1

65 Fed. Reg. 46,096 (July 27, 2000)............................................................................................ 28

Federal Rules of Civil Procedure § 56 ........................................................................................ 1

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 56, plaintiff General Electric Company ("GE") hereby moves for summary judgment on its pattern and practice claim that EPA's exercise of its Section 106 unilateral administrative order ("UAO") authority violates constitutional due process.  *See* 42 U.S.C. § 9606.  GE brings this motion in light of the undisputed evidence – including the admissions of EPA's own witnesses – that (1) potentially responsible parties ("PRPs") suffer unavoidable, substantial, and immediate deprivations of property and liberty at the time a UAO is issued and becomes effective, (2) EPA's pattern and practice in issuing UAOs confirms the feasibility of pre-deprivation hearings and the high risk of error in their absence, and (3) EPA policy robs PRPs of any meaningful choice but to comply with UAOs.  The dispositive EPA admissions, which mirror the testimony of GE experts and fact witnesses, establish as a matter of law that EPA's UAO pattern and practice violates due process under both *Mathews v. Eldridge*, 424 U.S. 319 (1976) and *Ex parte Young*, 209 U.S. 123 (1908).

## SUMMARY OF ARGUMENT

On March 30, 2005, the Court granted EPA's motion to dismiss GE's facial due process challenge to Section 106 of CERCLA, but held that GE could proceed with discovery on its pattern and practice due process challenge.  Discovery has been completed, and the Court now has the opportunity to examine the constitutionality of CERLCA Section 106, not simply as written, but as actually interpreted and administered by EPA.

The undisputed record before the Court makes clear that EPA's sterile description of the text of CERCLA bears little resemblance to how EPA actually exercises its authority under the statute and lays to rest the assertions on which EPA has heretofore relied in this and other courts to defend its UAO authority.  As administered by EPA, the UAO regime violates procedural due

506876v2

process under the tests of both *Mathews v. Eldridge*, 424 U.S. 319 (1976), and *Ex parte Young*, 209 U.S. 123 (1908).

    A.    <u>EPA's Pattern and Practice in the Issuance of UAOs Violates PRPs' Due Process Rights Under *Mathews v. Eldridge*</u>

With regards to *Mathews v. Eldridge*, there has never been any question that a PRP that *complies* with a UAO suffers significant deprivations of property and liberty before any possibility of a hearing through the significant costs of the UAO and the diversion of human resources to perform the ordered actions.  Thus, the key issue for the Court is whether a PRP can avoid a pre-hearing deprivation by choosing *not* to comply with a UAO.  Previously in this case, EPA has insisted that, under the bare statutory text of CERCLA, a PRP can choose not to comply without suffering any pre-hearing deprivation of property or liberty.[1]  The evidentiary record now before the Court conclusively disproves EPA's central assertion.

The undisputed evidence – including the testimony of EPA's own expert witness – demonstrates that a UAO causes an immediate deprivation of property and liberty upon its issuance and effective date, *and that the deprivation is not avoided (indeed, it is exacerbated) if a PRP chooses not to comply with the order.*  As both EPA and GE expert witnesses explain, noncompliance with a UAO would result in an immediate deprivation because it (1) creates an average contingent liability in the tens of millions of dollars that has contemporaneous adverse impacts on a PRP's stock price and costs of obtaining financing and (2) damages a PRP's environmental reputation, with immediate consequential damage to the value of a PRP's brand and to its relationship with a variety of stakeholders, including customers, suppliers, employees, and regulators.  *See* General Electric's Statement of Undisputed Facts, filed herewith at ¶¶ 3-34

---

[1] *Gen. Elec. Co. v. Johnson*, 362 F. Supp. 2d 327, 339 (D.D.C. 2005) (concluding that GE had "fall[en] short of establishing that a PRP, *under the language of the statute alone*, suffers a cognizable deprivation of property upon the issuance of a section 106 order") (emphasis added).

(hereinafter "SUF ¶ __").[2]  PRPs suffer further unavoidable pre-hearing deprivation due to

EPA's pattern and practice of requiring PRPs to expend significant resources within a matter of

days of the issuance of a UAO to assert all of their "sufficient cause" defenses to a UAO or risk

having them waived.  SUF ¶ 35.

    *EPA's expert*, Dr. Donald Siegel, repeatedly conceded that "there would be some

negative impact on a firm's stock price and on the costs it has to pay on its bonds following a

decision not to comply with a UAO at the time the market becomes aware of that [decision]."

SUF ¶ 4.  Dr. Siegel noted that investment firms "do a very comprehensive job" tracking

environmental activities, including through monitoring of EPA's CERCLIS database (which sets

forth every UAO issued by EPA), and agreed that it is likely that some investment firms would

report a PRP decision not to comply with a UAO.  SUF ¶ 15. Dr. Siegel also described the many

ways in which events that impair a PRP's environmental image can also diminish the value of a

company's brand and through "lower product sales, decreased access to talented workers, and a

higher cost of capital."  SUF ¶¶ 10, 12.  This EPA expert testimony is in full accord with an

econometric analysis by GE expert, Dr. John Geweke, of historical market reactions to notices of

contingent Superfund liabilities demonstrating the immediate and substantial impacts of UAO

issuance (and of UAO noncompliance) on a PRP's stock price and costs of financing, SUF

¶¶ 26-34.  It is also consistent with the conclusions of GE expert, Dr. Jason Johnston, regarding

the immediate adverse financial impact of the issuance of a UAO (and of UAO noncompliance)

on the value of a firm's brand asset.  SUF ¶¶ 7, 9, 11, 15, 20-22.

---

[2] Highlighted copies of declarations, deposition transcripts, expert reports, and exhibits
referenced in this memorandum and in the accompanying statement of undisputed facts are
provided in separately identified folders in a CD submitted herewith (expert reports and exhibits
are submitted under cover of a declaration of Eric G. Lasker).

These undisputed facts require that summary judgment be granted in favor of GE with respect to the first step of *Mathews v. Eldridge*: whether government action results in a pre-hearing deprivation of property or liberty.  Given the existence of pre-hearing deprivation, the Court must turn to the remainder of the *Mathews* test – the weighing of government interest, private interest, and risk of error.

Once again, discovery provides the Court with an unprecedented evidentiary record of EPA's patterns and practices.  The record leaves no genuine issue of fact that the *Mathews* balancing test requires a constitutionally adequate hearing *at the time a UAO is issued.*  In particular, the testimony of EPA Rule 30(b)(6) witnesses and internal EPA documents and enforcement data establish that:

- <u>EPA does not issue UAOs in response to environmental emergencies</u> – Despite the statutory prerequisite of "imminent and substantial endangerment," EPA witnesses rejected the proposition that EPA can issue UAOs only in cases of emergency.  To the contrary, they testified that UAOs are *not* used in emergencies (instead, EPA typically funds emergency cleanups out of the Superfund).  This frank testimony is strongly supported by the data in EPA's internal database of its Superfund activities ("CERCLIS") which shows, *inter alia*, that EPA waits more than 8 years on average before issuing a UAO at a CERCLA site.  SUF ¶¶ 37-47

- <u>EPA staff issues UAOs to meet periodic quantitative targets used in their employee evaluations</u> – Tracking the timing of internal personnel reviews, the issuance of UAOs spikes sharply at the end of the fiscal year and fiscal quarters.  Fully 25% of all UAOs since 1982 – with a total estimated cost of nearly $1.5 billion – were issued during the last three days of the second, third, and year-end fiscal quarters, and the value of UAOs issued in the last three days of the fiscal year (September 28, 29 and 30) exceeds that of UAOs issued in every month other than

those ending the fiscal second and third quarters.  This evidence further undermines any claim that UAOs are issued in response to an "emergency" and highlights the risk of error.  SUF ¶¶ 48-57.

• <u>EPA uses UAOs to shield its selected remedies from impartial judicial review</u> – EPA admits that it shifted to an "enforcement first" approach of presumptive use of UAOs because courts were rejecting EPA-proposed remedies sought through Section 106 cases brought in district courts.  Thus it was the judicial findings of error by EPA that led to the use of UAOs; the risk of error is unlikely to decline when the possibility of impartial review is removed.  SUF ¶¶ 63-67.

• <u>EPA uses UAOs to coerce PRPs into agreeing with onerous provisions in EPA's model consent settlement decree</u> – As EPA witnesses acknowledged, EPA seeks to pressure PRPs to enter into EPA-dictated settlement terms by making the alternative – UAOs – "ugly, onerous, and tough," and by threatening (and imposing) work requirements in UAOs that are not necessary to address environmental issues at the site.  SUF ¶¶ 74-80.

• <u>EPA extends the length of UAOs so as to delay any post-deprivation review</u> – EPA accomplishes this goal by adding new work requirements under a UAO years after the UAO is issued and by withholding certificates of completion based upon a self-acknowledged malleable definition of "completion."  SUF ¶¶ 85-96.

• <u>EPA selects remedies based on political factors rather than environmental risks</u> – EPA's selection of remedies is often driven by extraneous political factors rather than by site conditions and frequently bear no relation to its own assessments of health risks, as reflected in EPA "hazard ranking scores."  Further, EPA remedies on average cost hundreds of millions if not billions of dollars for each prospective case of cancer avoided – making them not simply

economically wasteful but counterproductive by diverting resources that otherwise would be more productively used in promotion of public health.  SUF ¶¶ 104-116.

In light of this undisputed evidence of EPA's pattern and practice, GE is entitled to summary judgment on its due process claim.  Particularly because EPA uses UAOs for purposes other than addressing environmental emergencies, it cannot claim any legitimate governmental interest in precluding PRPs from obtaining a meaningful hearing before the orders go into effect.  Nor can EPA deny that its pattern and practice in increasing the cost and duration of UAOs heightens PRP's private interest in securing such review.  And the risk of error is not only inherent in EPA's unilateral patterns and practices, but evident in the data regarding its selected site remedies.  In the words of *Mathews*, PRPs targeted by EPA for the issuance of a UAO must be provided "an opportunity to be heard at a meaningful time and in a meaningful manner," and GE requests that EPA be required to provide PRPs such opportunity.  *Mathews*, 424 U.S. at 333

> B.   EPA's Pattern and Practice in the Issuance of UAOs Violates PRP's Due Process Rights Under *Ex parte Young*.

GE is also entitled to summary judgment under the separate due process standard set forth in *Ex parte Young*.  GE's discovery has exposed EPA patterns and practices that deprive PRPs of any meaningful opportunity to say "no" to a UAO.  EPA's response that PRPs can choose to defy a UAO in reliance on a "sufficient cause" defense and a hope for lenience from CERCLA's onerous penalty provisions is belied at the most basic level by the record of PRP acquiescence over the past twenty-seven years.  EPA's CERCLIS database identifies over 1,705 UAOs issued since 1982 and only a handful of enforcement actions for UAO noncompliance.  EPA witnesses confirm that financially-viable PRPs very rarely violate a UAO.  SUF ¶¶ 150-153.  But discovery has demonstrated further the pattern and practice through which EPA has secured this virtually unbroken compliance record.

First, EPA pursues strategies to increase the already coercive threat of penalties and punitive damages.  Because of the significant costs and duration of UAOs – and EPA's policy of pursuing the maximum statutory penalties and punitive damages for noncompliance – a PRP considering whether to comply with an average UAO (as defined by EPA data) is faced with a contingent liability of at least $54 million if it says "no."  SUF ¶¶ 122, 125.  EPA has steadfastly resisted efforts by the Department of Justice to promote polices, such as a temporal cap on daily penalties, that would lessen this financial threat.  SUF ¶¶ 127-129.  To the contrary, EPA has adopted the pattern and practice of threatening separate daily penalties for different alleged violations under a single UAO, thereby magnifying the contingently liability created by the $32,500 in daily penalties many times over.  SUF ¶ 133.

Second, while the text of CERCLA provides that a PRP may interpose a "sufficient cause" defense against the imposition of daily penalties or punitive damages, EPA's pattern and practice renders that safe harbor illusory.  For example, EPA has consistently refused to provide any guidance on the meaning of the "sufficient cause" defense, reasoning that PRP confusion will best assure compliance with all UAOs.  SUF ¶¶ 136-137.  EPA also has forced PRPs to identify all sufficient cause defenses within days of receipt of a UAO on threat of having the defenses deemed waived and has removed any opportunity for a PRP even to discuss such defenses with EPA at a "UAO conference" to discuss implementation of the order.  As EPA frankly asserted in one of the very rare occasions in which it was required to enforce a UAO in court, given EPA pattern and practice, a PRP that elects not to comply with a UAO based on its subjective belief in a sufficient cause defense "does so at its peril."  SUF ¶ 140.

Third, EPA deprives PRPs of any expectation of a meaningful review of a UAO during an enforcement hearing through its strategic shaping of the administrative record.  EPA's

practice is to construct the administrative record so as to minimize "the amount of adverse comments" contradicting EPA's selected remedy.  SUF ¶ 160.  EPA thus excludes from the administrative record documents reflecting internal consideration of site remedies, the very documents most likely to demonstrate that EPA has acted in an arbitrary and capricious manner. SUF ¶ 161-162.

Through such patterns and practices, EPA has imposed "such conditions upon the right to appeal for judicial relief as works an abandonment of the right rather than face the conditions upon which it is offered."  *Ex parte Young*, 209 U.S. at 147.  EPA's UAO pattern and practice should be declared unconstitutional on this ground as well.

## STATEMENT OF THE CASE

### A.    Statutory Background

The basic CERCLA statutory framework is set forth in the Court's March 2005 opinion. *Gen. Elec. Co. v. Johnson*, 362 F. Supp. 2d 327, 330-31 (D.D.C. 2005).  That discussion is hereby incorporated by reference.  However, as discussed throughout this memorandum, discovery has repeatedly demonstrated how EPA pattern and practice has distorted the statutory framework so as to deprive PRPs of whatever due process protections might theoretically be allowed by the text of the CERCLA statute.

As explained more fully herein, EPA abuses the CERCLA statutory scheme to issue coercive UAOs as a matter of routine, imposing immediate and substantial deprivations on PRPs without any possibility for meaningful or timely review.  Upon receipt of a UAO, a PRP faces a Hobson's choice of complying with a UAO, and committing itself on average to millions of dollars of work and years of enforced work obligations, or not complying with the UAO and suffering greater, immediate deprivations of property and liberty through impacts on its stock

price, cost of financing, brand value, and stakeholder relationships.  In either case, a PRP cannot

secure pre-deprivation review, nor can it obtain any post-deprivation review for many years –

and then only at a time of EPA's choosing and on a record strategically shaped by EPA.  The

inadequacy of this post-deprivation review is confirmed by the fact that only a single PRP – out

of all of the thousands of PRPs identified in the 1,705 UAOs issued since 1982 – has ever

prevailed in securing a ruling ordering EPA to reimburse its costs under a UAO.  PRP's forced

compliance with UAOs is so complete that only on a handful of occasions has EPA even seen

the need to pursue an enforcement action against a PRP based on its decision not to comply with

a UAO.  SUF ¶¶ 150-153.

   B.  <u>Prior Proceedings in the Case</u>

   GE filed its initial complaint on November 28, 2000, and an amended complaint on

March 14, 2001.  EPA has twice moved to have the case dismissed, with its first attempt rejected

on appeal by the D.C. Circuit, and its second attempt rejected in part by the Court in its March

2005 opinion granting EPA summary judgment on GE's facial due process challenge but

allowing GE to obtain discovery in support of its pattern and practice claim.  *See Gen. Elec. Co.

v. EPA*, 360 F.3d 188 (D.C. Cir. 2004); *Johnson*, 362 F. Supp. 2d 327.

   With the assistance of the Court, the parties have engaged over the past three years in

extensive discovery, including the production of tens of thousands of documents by both parties,

depositions of numerous Rule 30(b)(6) fact witnesses, the exchange of six expert and rebuttal

expert reports, and expert depositions.  On September 12, 2006 and February 5, 2007, the Court

issued detailed discovery rulings in response to a GE motion to compel, which resulted in

disclosure of all or part of some 3,000 documents EPA had sought to withhold on various

grounds of privilege.  *Gen. Elec. v. Johnson*, No. Civ.A.00-2855, 2006 WL 2616187 (D.D.C.

Sept. 12, 2006) ("*Johnson Discovery I*"); *Gen. Elec. v. Johnson*, No. Civ.A.00-2855, 2007 WL

433095 (D.D.C. Feb. 5, 2007) ("*Johnson Discovery II*").

Discovery is now complete.

## ARGUMENT

"[T]he root requirement of the Due Process Clause" is "that an individual be given an

opportunity for a hearing before he is deprived of any significant property interest." *Cleveland*

*Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citations omitted); *see also United States*

*v. James Daniel Good Real Prop.*, 510 U.S. 43, 55 (1993). Agency adjudicatory decisions

directed at specific persons invariably trigger the due process right to individualized hearings

before a trial-type tribunal, and there is no dispute that UAOs set forth EPA adjudicative

determinations triggering due process protection.[3]  *See*, *e.g.*, *Logan v. Zimmerman Brush Co.*,

455 U.S. 422, 433-34 (1982); *Londoner v. Denver*, 210 U.S. 373 (1908). Where an agency

makes adjudicative determinations, it is "imperative" that the agency "use the procedures which

have traditionally been associated with the judicial process." *Hannah v. Larche*, 363 U.S. 420,

442 (1960).[4]

---

[3] As the Court explained: "UAOs may essentially be viewed as condensed prosecutions and
adjudications; they initiate adversary proceedings against a PRP, but simultaneously constitute a
statement that the PRP is legally responsible for the violation and require the PRP to remedy
wrongs through the fulfillment of certain responsibilities and penalties (*i.e.*, UAOs regulate
conduct of PRPs)." *Johnson Discovery I*, 2006 WL 2616187 at *15 n.5

[4] Put another way, when agencies make adjudicative findings – i.e., determinations regarding
"those facts which 'usually answer the questions of who did what, where, when, how, [and] why
. . . , roughly the kind of facts that go to a jury in a jury case,'" *Friends of the Earth v. Reilly*, 966
F.2d 690, 693 (D.C. Cir. 1992) (quoting 2 Kenneth Culp Davis, Administrative Law Treatise
§ 12:3 at 413 (2d ed. 1979)) – they must provide the protection afforded by a hearing, *see, e.g.,*
*United States v. Fla. East Coast Ry.*, 410 U.S. 224, 244 (1973); *Hannah*, 363 U.S. at 442; *Gray*
*Panthers v. Schweiker*, 652 F.2d 146, 156 n.18 (D.C. Cir. 1980).

The issue before the Court is whether EPA's pattern and practice in its issuance and enforcement of UAOs under Section 106 of CERCLA violates procedural due process. This is the first case in which any court has considered this due process issue based on a full evidentiary record. The record developed through discovery in this case invalidates the arguments previously proffered by EPA in opposition to GE's facial due process claim, and it renders moot the understanding of the courts in other circuits that have credited those arguments. In light of the undisputed evidence established in this case, GE is entitled to summary judgment under both *Mathews v. Eldridge* and *Ex parte Young*.

I.      **EPA's Pattern and Practice in Exercising its UAO Authority Violates PRPs' Constitutional Right to Due Process under *Mathews v. Eldridge*.**

The United States Supreme Court in *Mathews* established a two-step process for determining whether government action deprives a party of due process. <u>First</u>, the Court must determine whether the plaintiff has been deprived of a protected interest in property or liberty prior to a hearing. <u>Second</u>, if deprivation is shown, the Court must engage in a three-part balancing test weighing the government interest, the private interest, and the risk of error to determine what procedural protections are required to satisfy the requirements of due process. *See Johnson*, 362 F. Supp. 2d at 338.

The Court opined in March 2005 that, based on the text of CERCLA, a PRP does not suffer a deprivation at the time it is issued a UAO, on the theory that the PRP has the option of saying "no" and sitting back without any consequence to its property or liberty interest until EPA brings an enforcement action in federal district court: "The ability of a PRP to choose, *under the language of the statute*, whether to comply with a section 106 order is key. Upon a refusal to comply with a section 106 order, EPA is powerless to deprive the PRP of property without judicial intervention." *Id.* at 339 (emphasis added). Based on this misunderstanding, the Court –

like other courts confronting the issue – did not reach the *Mathews* three-part balancing test.  *See*

*Raytheon Aircraft Co. v. United* States, 501 F. Supp. 2d 1323, 1328 (D. Kan. 2007 ("nearly every

court that has addressed a *facial* challenge to section 106 has held that the issuance of a UAO

does not trigger a property deprivation on the grounds that the EPA can only force compliance

after judicial intervention and, until that time, there has been no deprivation") (emphasis added;

citing cases).

      With the benefit of an evidentiary record, however, it is now undisputed that PRPs *do*

suffer an immediate deprivation of property and liberty upon a UAO's issuance and effective

date, and that the deprivation cannot be avoided – indeed it is exacerbated – by a refusal not to

comply.  That is, the undisputed evidence satisfies the first step under *Mathews* of a pre-hearing

deprivation.  The undisputed evidence also demonstrates that the *Mathews* three-part balancing

test weighs decidedly in favor of requiring a meaningful hearing prior to the effective date of a

UAO.

      A.    <u>The Issuance of a UAO Imposes an Immediate Deprivation of Property and
Liberty.</u>

      Upon receipt of a UAO, a PRP suffers an immediate and unavoidable pre-hearing

deprivation of property and liberty, whether it complies with the UAO or not.  EPA has never

contested that a PRP that complies with the UAO suffers such pre-hearing deprivations through

the costs and required actions ordered under the UAO itself; GE thus will not further address

such deprivations in this brief.  EPA previously has contested – albeit without record evidence –

that a pre-hearing deprivation occurs in cases of UAO noncompliance.  The undisputed evidence

discussed below shows, however, that a PRP that does not comply with a UAO suffers pre-

hearing deprivations through (1) adverse impacts on the PRP's stock price and cost of financing,

(2) a drop in the value of the firm's brand and impairment of its relationships with key

stakeholders such as customers, suppliers, employees, and regulators, and (3) actions that the PRP is required to take and expenditures it must incur in a matter of days upon issuance of the UAO.

The first part of the *Mathews* analysis accordingly is satisfied.

        1.      <u>A Decision Not to Comply with a UAO Has An Immediate Adverse Impact on a PRP's Market Value and Cost of Financing.</u>

EPA and GE proffered three experts to testify about the impact of a PRP decision not to comply with a UAO on the PRP's stock price and cost of financing. *All three of these experts agreed* that a PRP decision not to comply with a UAO would impose an immediate, adverse, pre-hearing impact on the company, both through a drop in value of the non-complying PRP's stock and an increase in its costs of obtaining financing. SUF ¶¶ 3-6, 15, 20, 26-34.

Notably, EPA's expert Donald Siegel repeatedly admitted that a decision not to comply with a UAO would result in immediate adverse financial impacts before the PRP has any opportunity to challenge the order in court:

- "[T]here would be some negative impact on a firm's stock price and on the costs it has to pay on its bonds following a decision not to comply with a UAO at the time the market becomes aware of that [decision]." SUF ¶ 4.

- "[T]he stock market would react to news of a firm's decision not to comply with a UAO at the time the news first becomes available to the market." *Id.*

- "[I]t's likely that the market would respond negatively to a failure to comply with a UAO." *Id.*

- "A decision by GE not to comply with a UAO … would have a negative impact on some investors' decisions whether to invest in GE." SUF ¶ 20.

- "[I]t's clear that there's a negative impact." SUF ¶ 4.

Dr. Siegel acknowledged that the equities and financial markets would likely learn promptly of the issuance of, or a PRP's decision not to comply with, a UAO and would react without waiting for EPA to bring an enforcement action. SUF ¶¶ 4, 5, 15. EPA publicizes its

issuance and enforcement of UAOs "as a matter of routine" SUF ¶ 25, and, as Dr. Siegel

explained, "shareholders and lending institutions are increasingly concerned about the prospect

of future environmental liability for pollution harms caused by a firm."  SUF ¶ 6.  Dr. Siegel

noted that various socially responsible investor ("SRI") firms "do a very comprehensive job of

tracking … environmental activities" and monitor EPA's CERCLIS database (which includes

information on UAOs).  He agreed that "it's likely" that such firms would report a PRP's

decision not to comply with a UAO.  SUF ¶ 15.  GE's expert, Dr. Johnston, confirmed that

market participants would learn about the issuance of a UAO "with great rapidity."  *Id.*[5]

Because the equities and financial markets are efficient, the markets would immediately

incorporate the contingent liability created by a decision not to comply with a UAO into the

market value and creditworthiness of the firm.  SUF ¶ 5.  GE's expert, Dr. Geweke, explained:

> The impact of a contingent liability on stock price and bond yields
> occurs when the existence of the contingent liability first becomes
> known, and not at the time the liability is discharged.  The
> economics and finance literature is unanimous and unambiguous in
> this prediction about timing and the prediction has been verified
> repeatedly in statistical studies.

*Id.*; Geweke Report at ¶ 48; *see also id.* at ¶¶ 49-51 (providing further explanation of efficient

markets hypothesis); *see also* Johnston Report at ¶ 28 ("A large body of work has found that

publicly traded firms suffer statistically significant losses of stock market value when the market

receives new information about negative environmental events affecting the firm.  The way in

which EPA uses Section 106 UAOs makes it highly likely that the issuance of a UAO, and a

---

[5] Dr. Johnston noted that "[o]ne of the most dramatic changes that has occurred in the investment world over the past two decades is the rise of so-called 'ethical' or 'green' mutual funds." Johnston Report, at ¶ 24.  Dr. Johnston also cited a 2001 survey in which 52% of fund managers and analysts stated that environmental considerations would become a significant aspect of mainstream investment decision-making.  *Id.*

decision not to comply with a UAO, will convey precisely such new and negative information.").

Given the possibility of daily penalties and treble punitive damages in addition to the cost of the

UAO itself, the contingent liability created by a decision not to comply with a UAO is

significant. *See* SUF ¶ 122.[6]

     Dr. Geweke conducted a detailed regression analysis of real world market and EPA

enforcement data that confirmed the immediate adverse impact of a decision not to comply with

a UAO on a PRP's stock price and cost of financing.  Dr. Geweke analyzed stock price data for

916 firms and financing cost data in connection with 357 bonds issued by 153 firms to determine

whether those firms suffered an adverse financial impact due to contingent CERCLA liabilities.

Geweke Report, at ¶ 11.  His analysis confirmed a statistically significant adverse impact, both

---

[6] The possibility of a "sufficient cause" defense or judicial leniency in the assessment of
penalties would not alter the undisputed fact that noncompliance with a UAO would have an
immediate adverse impact on the PRP.  As Dr. Geweke explained:

> It is possible that the market may discount these potential liabilities
> based on its perception of the strength of a company's defense
> against the UAO itself or a "sufficient cause" defense against
> treble damages and penalties, just as it is possible that markets
> correctly discount the future costs for a firm receiving a special
> notice letter based on the contingency that other PRPs will share
> cleanup costs.  Further, the market may also take into account the
> possibility that a district court, even if it found that the PRP lacked
> sufficient cause to challenge the order, might nonetheless exercise
> its discretion to impose less than the maximum potential daily
> penalties or punitive damages.  *While this possibility might lessen*
> *somewhat the immediate financial impacts of a decision not to*
> *comply with a UAO, the difference would be one only of*
> *magnitude.  The impact of this decision would still be immediate,*
> *significant and adverse.*

SUF ¶ 30 (emphasis added).

on stock price and on the price the firms were required to pay in bond yields.  *See id.* at ¶ 12; *see also* SUF ¶ 29 (Dr. Siegel confirming that Dr. Geweke's findings were statistically significant).[7]

Dr. Geweke calculated that a decision not to comply with a UAO would result, on average, in an immediate drop in a company's market value of $78 million.  SUF ¶ 28.  This drop would come on top of the $12 million drop in market value caused by the special notice to the firm of its contingent liability to pay the costs of the cleanup (*e.g.*, if it elected to comply with the UAO).  *Id.*  Although EPA's expert Dr. Siegel disputed the magnitude of this impact, he agreed that there would be an immediate negative impact.  *Id.*

Dr. Geweke further determined that

> The magnitude of the financial consequences of a decision not to comply with a UAO is dramatic and far exceeds the magnitude of the consequences of a special notice letter issued for the same site. A firm's decision not to comply with a UAO issued for a Superfund site subjects the firm to a loss in market value that is 5.9 times greater than the loss in market value arising from a special notice letter. *The impact of this additional, 5.9-fold decrease on a firm's stock prices and bond yields is immediate, occurring at the time it announces its election not to comply with a UAO.*

SUF ¶ 31.  Dr. Geweke's analysis demonstrates that companies that elect not to comply with UAOs would suffer a median decline in stock price of 9.8% and a median proportionate increase

---

[7] Because of the paucity of cases in which a solvent PRP has elected not to comply with a UAO, Dr. Geweke began his analysis with a calculation of market reactions to a PRP's receipt of a special notice letter under CERCLA.  Special notice letters are issued at the start of a statutory moratorium period for EPA-PRP discussions at Superfund sites, after which there generally will be entry of a consent decree or issuance of a UAO.  At the special notice letter stage, EPA advises a firm that it is considered a PRP at a site and that EPA is looking to the PRP to fund a response action; the company is not, however faced with the additional contingent liability of potential daily penalties and treble punitive damages for UAO noncompliance.  Compared to UAOs, special notice letters give rise to a similar, though smaller, contingent liability.  Dr. Geweke used this market data in calculating that the immediate financial impacts on the PRP electing not to comply with a UAO would be even more dramatic.  *See* Geweke Report at ¶¶ 17, 19.

in bond yields of 3.5%.  SUF ¶ 32.  To put such contingent liabilities in context, "[f]or most of these firms, a decision not to settle and not to comply with UAOs would be a decision to create a contingent liability greater than unfunded pension liabilities or any other contingent liability the firm confronts."  SUF ¶ 33.

These impacts are far more severe than many other financial effects held to constitute a deprivation of property.  The Supreme Court has repeatedly held that even small financial impacts are sufficient to trigger procedural due process protections.  *Sniadach v. Family Fin. Corp.*, 395 U.S. 337 (1969), for example, involved a personal debt on a promissory note and the ex parte deprivation, by garnishment, of $31.59 in wages deposited in a bank account.  *Fuentes v. Shevin*, 407 U.S. 67 (1972), involved the replevin of a stove and stereo whose value was approximately $500.00.  In *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 606 (1975), the Court held that a due process hearing was required before imposition of a garnishment whereby "a bank account, surely a form of property, was impounded and, absent a bond, put totally beyond use during the pendency of the litigation."

The Supreme Court has also held that plaintiffs incur a deprivation of constitutionally protected property where – as here – government action "clouds title, impairs the ability to sell or otherwise alienate the property; taints any credit rating; [or] reduces the chance of obtaining a home equity loan or additional mortgage."  *Connecticut v. Doehr*, 501 U.S. 1, 11 (1991).  Moreover, even "temporary or partial impairments to property rights" "are sufficient to merit due process protection."  *Id.* at 12.  In *Reardon v. United States*, 947 F.2d 1509 (1st Cir. 1991) (en banc) the First Circuit (including then Chief Judge Breyer) held the CERCLA lien provision unconstitutional, even though a lien does not deprive the owner of use or possession of the land.  *Id.* at 1518.  The court opined that a lien effected a deprivation of property because it potentially

"cloud[ed] title, limit[ed] alienability, [and] affect[ed] current and potential mortgages."  *Id.*[8]

*See also Leslie v. Lacy*, 91 F. Supp.2d 1182, 1191 (S.D. Ohio 2000) (holding unconstitutional, as

a violation of procedural due process, a state statute permitting lienholders to obtain certificates

of title for mobile homes after repossessing them, without pre-deprivation notice or a hearing,

because "[E]ven the temporary or partial impairments to property rights that attachments, liens,

and similar encumbrances entail are sufficient to merit due process protection") (internal

quotation marks and citation omitted).

Given the undisputed, immediate adverse market impacts of a UAO, even if the PRP does

not comply, EPA's prior arguments that PRPs do not suffer a pre-hearing deprivation upon

issuance of a UAO plainly are without merit.  Based on these impacts alone, GE has satisfied the

first prong of the *Mathews v. Eldridge* analysis.

2.       A Decision Not to Comply with a UAO Has an Immediate Adverse
         Impact on the Value of a PRP's Brand.

But these are not the only adverse impacts.  A PRP electing not to comply with a UAO

would also suffer a pre-hearing deprivation of property and liberty due to the negative impact on

the value of the PRP's corporate brand.  *See* SUF ¶ 11 (impact on environmental brand creates

deprivation independent of impact on stock price or cost of financing).  As with the impacts on

stock price and cost of financing, this impact is undisputed, having been confirmed by *both* EPA

and GE experts.

EPA's expert Dr. Siegel testified that a firm's "brand," *i.e.*, a name that is recognized and

respected by consumers of the firm's goods and services, can be one of its most valuable assets.

---

[8] In distinguishing *Reardon,* this Court previously stated that the CERCLA UAO provisions do
not, according to their text, have the same impact on property as the CERCLA lien provisions.
362 F. Supp.2d at 339.  But discovery has shown that, in practical operation, the mere issuance
of a UAO also has an "immediate significant impact on a property interest."  *Id.*

SUF ¶ 7.  GE's expert Dr. Johnston likewise opined that a company's brand "is an important and indeed sometimes the most valuable intangible asset that a corporation owns."  *Id.*  "[B]rands and other intangible assets have become 'dominant value drivers' in today's corporate world:  The Coca Cola Corporation, for example, has a stock value of around $115 billion but a book (or tangible asset) value of only $15 billion.  For the Fortune 500, intangible assets make up a full 75% of total assets."  Johnston Report, at ¶ 8.  GE's corporate brand, for example, has been valued by independent sources at between $49 and $62 billion.  SUF ¶ 8; *see also id.* (Dr. Siegel agreeing that "GE has a valuable corporate brand").

Importantly, both Drs. Siegel and Johnston agreed that a company's perceived environmental performance is a component of the value of its brand.  Dr. Johnston explained:  "For many firms, corporate environmental performance is a key contributor to the value of a corporate brand.  Indeed, it is no exaggeration to say that the amount that firms are investing to build their 'environmental brand names' is exploding."  Johnston Report at ¶ 9.  Speaking specifically of GE, Dr. Siegel agreed that GE's environmental performance is "clearly a component" of its brand, and that "the value of GE's environmental brand depends in part upon how relevant stakeholders view GE's environmental record."  SUF ¶ 17 ("the value of GE's environmental brand is also based on how GE's environmental reputation is viewed by other stakeholders including employees and customers").  Independent third parties confirm that the value of GE's brand is driven in significant part by its environmental reputation, and have pointed to GE's enhanced environmental reputation as a major factor in a recent three-year surge of over $7.5 billion in the value of its brand.  SUF ¶ 18.[9]

---

[9] Drs. Siegel and Johnston also agreed that GE – because of its significant investment in positioning itself as an environmental leader through its Ecomagination campaign – is uniquely vulnerable to the adverse impact to its brand value of contingent CERCLA liabilities and

Because of the negative impact on a PRP's environmental image, the issuance of a UAO – particularly if a PRP decides not to comply – would cause immediate financial harm to the PRP by lowering the value of its environmental brand asset.   SUF ¶¶ 11-13, 17-18, 21-22; *see also* SUF ¶ 20 ("a decision by GE not to comply with a UAO … would have a negative impact on some investor's decision whether to invest in GE").  As Dr. Siegel explained, firms that are recognized as environmentally irresponsible face adverse consequences such as "lower product sales, decreased access to talented workers, and a higher cost of capital."  SUF ¶ 12.  Dr. Siegel also testified that a firm's environmental image has an impact on its relationships with a variety of the firm's stakeholders, including customers, employees, and regulators.  SUF ¶ 13.  Dr. Johnston explained that these impacts would be immediate and could not be repaired by an eventual legal challenge:

> When EPA issues a UAO to a Superfund PRP, if the PRP were to elect not to comply with the UAO, then the PRP would immediately suffer harmful economic consequences *that could not be remedied though later, delayed legal challenge.*  In today's world, negative environmental events and regulatory non-compliance in particular are immediately communicated to very broad and diverse corporate stakeholders, ranging from investors, lenders, and consumers to regulators, environmental non-governmental organizations and community groups.  If a PRP were to refuse to comply with a UAO, it would be subject to immediate negative publicity as being in non-compliance with a regulatory order.  Such regulatory non-compliance would lower the value of the firm's environmental brand asset, causing a loss of stock market value and harming the firm's relationship with consumers, lenders, regulators and environmental non-governmental organizations.

---

perceived noncompliance with an environmental order.  SUF ¶ 21; Johnston Report at ¶ 3 ("Such value loss is likely to be especially large for General Electric (GE), because GE has an enormously valuable corporate brand name that is directly tied to the firm's record of environmental regulatory compliance and leadership, plus equally great regulatory and public visibility."); *see also* Sheffer Dep. at 80-81, 83-84, 88; Ramsey Decl. at ¶¶ 7-11, 13-15.

SUF ¶ 22 (emphasis added).

EPA is well aware of the adverse impact of even the mere receipt of a UAO on a PRP's environmental image and stakeholder relationships.  EPA has trained its Superfund attorneys since the early 1990s to warn PRPs that they will suffer adverse public relations if they refuse to enter into a consent decree and instead are issued a UAO.  SUF ¶ 23.  EPA attorneys also are instructed to advise PRPs to agree to a consent decree in lieu of receiving a UAO because that will "help[] their relationship with EPA."  SUF ¶ 24.  *Cf.* SUF ¶ 9, Johnston Expert Report ¶ 7 ("EPA has itself not only recognized the importance to firms of establishing a brand name identity for good environmental performance, but has also created formal regulatory programs and mounted publicity campaigns to help firms create and advertise such environmental brand names.").

The undisputed impacts on the value of a PRP's corporate brand of a UAO and of UAO noncompliance deprive the PRP of both protected property interests and protected liberty interests.  As Drs. Siegel and Johnston agreed, a corporate brand is a valuable financial asset of any firm.  A government action that deprives a PRP of a portion of the value of that brand thus is no less a deprivation of property than if the government had seized one of the firm's factories.  Further, because EPA's issuance of a UAO and noncompliance with that UAO calls into question a PRP's good name, character, and reputation, UAOs also implicate a PRP's liberty interest.  *See Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972).  Controlling here is *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 962 (D.C. Cir. 1980), where the D.C. Circuit held that the Defense Department's administrative determination that a dairy lacked "integrity" deprived the dairy of a cognizable liberty interest without due process,

even though the court acknowledged that the dairy corporation "had no 'property' interest in the contract awards" that were jeopardized by the finding.  *Id.* at 961.

In *Old Dominion*, the D.C. Circuit explained, "where a person's good name, reputation, honor, or integrity is at stake because of what the Government is doing to him, notice and an opportunity to be heard are essential."  *Id.* at 963 (citation and internal quotation marks omitted). The court noted that an administrative "determination was made that Old Dominion 'lacked integrity,' and that determination was communicated through official Government channels and would likely continue to be communicated every time Old Dominion bid for a contract."  *Id.* The D.C. Circuit has adhered to this decision in a well-established line of cases.  *E.g.*, *Conset Corp. v. Cmty. Servs. Admin.*, 655 F.2d 1291, 1297 (D.C. Cir. 1981) ("charges calling into question [corporation's] integrity, honesty or business reputation" effected deprivation of liberty); *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983) (liberty deprived by government-imposed stigma that "severely impaired [corporation's] ability to take advantage of a legal right, such as a right to be considered for government contracts or employment"); *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1111 (D.C. Cir. 1985) (government defamation resulting in a "[l]oss of present or future government employment" implicates a liberty interest).

The D.C. Circuit has explained that government action damaging a plaintiff's reputation will give rise to a deprivation of liberty where "the resulting stigma 'alter[s] [its] status in a tangible way.'"  *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (quoting *Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995)); *see also Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204-05 (D.C. Cir. 2001) (stigmatization through identification as foreign terrorist organization implicates due process interests given impact of such identification on ability to hold bank accounts and obtain material

support and resources); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995) (liberty interest implicated where reputational injury "substantially reduce[s] the value of [plaintiff's] human capital"). This so-called "reputation plus" requirement is satisfied here. The tangible harms from the reputational injury caused by a UAO – through impacts on the value of a PRP's brand and on its relations with key economic and government stakeholders – are much more substantial than the potential loss of contracting opportunities found sufficient in *Old Dominion*.

The deprivation of property and liberty interests arising through the impacts of UAO issuance or noncompliance on brand value and on a PRP's reputation thus provide two additional reasons that the first prong of *Mathews v. Eldridge* is satisfied.

> 3.   <u>A UAO Requires An Immediate Expenditure of Resources by a PRP Before It Can Decide Whether to Comply.</u>

The mere issuance of a UAO results in a deprivation of property and liberty in yet another way – under EPA's pattern and practice, a UAO imposes an immediate requirement upon a PRP to decide how to respond to the order. Pursuant to EPA guidance and the routine terms of all UAOs, PRPs are required to respond to a UAO in a so-called "notice of intent to comply letter" within a matter of days after issuance. SUF ¶ 36; Patterson Dep. at 66-67. EPA requires PRPs to set forth in that response all of their "sufficient cause" defenses to a UAO; otherwise, such defenses will be deemed waived. SUF ¶ 142. As a result of this EPA pattern and practice, upon receipt of a UAO, a PRP must immediately commit significant financial and human resources to decide, first, whether it will comply with the UAO and, second, what its defenses will be if it elects not to comply.

The magnitude of these immediate obligations can be illustrated by GE's practice upon receipt of a UAO. Within one or two days of receipt of a UAO, GE retains outside counsel and

consultants to investigate the history, environmental conditions, and legal defenses at issue at the

site.  Given the very short deadlines imposed following the issuance of the UAO, GE is required

to proceed simultaneously on multiple tracks requiring use of in-house staff and external

resources at significant cost.  On the legal front, in order to present a full recitation of its legal

defenses, GE and its attorneys must investigate the historical record regarding the site (including

an extensive review of historic files and documents and interviews with relevant historical

personnel if available), the involvement of other companies, the nature of the contaminants at the

site, and the appropriateness of the selected remedy.  On the technical front, GE and its

consultants must review the Statement of Work (an extensive, detailed document that is

generally provided for the first time with the UAO) to determine whether the required actions are

feasible, to prepare a work schedule by which the actions can be achieved, and in the usual

course, to prepare a cost estimate.  All of these efforts must then be incorporated in what is often

a very substantial Notice of Intent to Comply letter, setting forth GE's legal and technical

positions with respect to the Order.  The significant costs must be incurred regardless whether

GE were (hypothetically) to elect not to comply with a UAO, and many of these costs cannot be

recovered.  Ramsey Decl. ¶¶ 21-23, 29.

   EPA's pattern and practice thus contradicts the understanding expressed by the Court in

its March 2005 opinion in distinguishing *Hodel v. Virginia Surface Mining*, 452 U.S. 264 (1981).

In *Hodel*, the Supreme Court held that the issuance of an administrative order requiring

immediate cessation of mining operations gave rise to a property deprivation, even though such

order required further administrative and judicial enforcement for the collection of property.  452

U.S. at 298-301.  Without the benefit of an evidentiary record, in March 2005, the Court believed

that *Hodel* was inapposite because compliance with a UAO "will generally entail a drawn out

undertaking, which may not even commence in a concrete term for months." *Johnson*, 362 F. Supp. 2d at 340. The evidence now before the Court demonstrates that there is no such "drawn out" respite. Like the order at issue in *Hodel*, a UAO issued pursuant to EPA's pattern and practice imposes immediate obligations on the recipient and thus gives rise to an immediate deprivation of property. *See also Pactiv Corp. v. Chester*, 455 F. Supp. 2d 680, 688 (E.D. Mich. 2006) (denying motion to dismiss due process challenge to state regulatory scheme analogous to CERCLA Section 106 noting, *inter alia*, that "[i]n this case, like *Hodel*, the government ordered Plaintiff to do something").

EPA's pattern and practice of requiring PRPs to provide within days a notice of intent to comply setting forth all of their sufficient cause defenses also constitutes a deprivation of liberty. EPA forces PRPs to make an immediate choice whether (1) to comply with a UAO, and thereby forego any opportunity for judicial review prior to expending financial and human resources to implement the order, or (2) to defy the order, and suffer the attendant deprivations in stock value, financing costs, brand value and the like. Numerous courts have held that this type of forced decision itself gives rise to a due process violation. *See La. Pac. Corp. v. Beazer Materials Servs., Inc.*, 842 F. Supp. 1243, 1252-53 (E.D. Cal. 1994) (EPA's conditioning of CERCLA consent decree on PRP's agreement to daily stipulated penalties for non-compliance and limited right to judicial review gives rise to due process concerns requiring analysis of government interest).[10]

---

[10] *See also Simmons v. United States*, 390 U.S. 377, 394 (1968) (invalidating forced choice between Fourth and Fifth Amendment rights); *United States v. Jackson*, 390 U.S. 570, 581-83 (1968) (invalidating forced choice scheme where a defendant could avoid the risk of a death sentence only by pleading guilty); *Contreras-Aragon v. INS*, 852 F.2d 1088, 1095 (9th Cir. 1988) (en banc) ("We would drastically depart from these [due process] principles were we to sanction a policy which effectively forced an alien to choose between exercising an award of voluntary departure and pursuing judicial review."); *Dixon v. Alabama Bd. of Educ.*, 294 F.2d 150, 156

Again, the evidentiary record leaves no dispute that the issuance of a UAO necessarily gives rise to a deprivation of constitutionally protected interests. The first prong of *Mathews v. Eldridge* is satisfied, and the Court must proceed to the three-part balancing test.

B.    A Balancing of Government Interest, Private Interest, and Risk of Error Compels the Finding that PRPs Are Entitled to a Meaningful Hearing Before a UAO Becomes Effective.

This case presents the first occasion on which any court has weighed, on a full evidentiary record, the government interest, private interest, and risk of error implicated by EPA's pattern and practice in its exercise of its Section 106 authority under CERCLA. The admissions in EPA's own documents and the testimony of its Rule 30(b)(6) designees greatly simplifies the Court's task and leaves no question that PRPs must be granted the right to a constitutionally adequate hearing before a UAO becomes effective.

1.    EPA Cannot Point to Any Credible Government Interest in Depriving PRPs of Pre-Deprivation Hearings.

In weighing the government interest factor of the *Mathews* three-part balancing test, the Court must consider "the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases prior to the [effective date of a UAO]." 424 U.S. at 347. The government may avoid the requirement for a pre-deprivation hearing only in extraordinary situations where immediate government action is "necessary to secure an important governmental or general public interest" and there is a "special need for very prompt action." *Calero-Toledo*, 416 U.S. 663, 678 (1974);

_____

(5th Cir. 1961) ("the State cannot condition the granting of even a privilege upon the renunciation of the constitutional right to procedural due process") (citing Supreme Court cases); *cf. George Washington Univ. v. District of Columbia*, 148 F. Supp.2d 15, 18 (D.D.C. 2001) (granting preliminary injunction against zoning board order; "The defendants counter with the suggestion that the Order is not directly enforceable and that the plaintiff would not be

*see also Roth*, 408 U.S. at 570 n.7 ("While '[m]any controversies have raged about . . . the Due Process Clause,' . . . it is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate (a protected) interest . . ., it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective.") (internal citation omitted).

In its prior briefing in this case, EPA has claimed that there is a government interest in allowing the issuance of UAOs without a hearing because UAOs are issued in cases of environmental emergency and hearings supposedly would delay the response to such emergencies.[11] To the extent other courts (albeit without discovery) have considered whether there is a government interest in avoiding such due process hearings, they likewise have focused on this claim. *See Wagner Seed Co. v. Daggett*, 800 F.2d 310, 315 (2d Cir. 1986) ("Congress envisioned a procedure that permits EPA to move expeditiously in the face of a potential environmental disaster."); *Aminoil, Inc. v. United States*, 646 F. Supp. 294, 299 (C.D. Cal. 1986) ("The Government's interest in handling emergency waste situations in an efficacious matter is clearly important").

With the benefit of discovery, however, this alleged government interest disappears. The undisputed evidence demonstrates: (1) EPA does not issue UAOs in response to environmental emergencies; (2) in genuine emergencies, EPA in fact typically undertakes the cleanup itself and pursues cost recovery from PRPs thereafter; and (3) the relatively lengthy EPA administrative delays both before and after issuance of UAOs leave ample time for a meaningful review without

---

significantly damaged by simply violating it. Such a suggestion is, of course, untenable for a great university").

[11] *See Johnson*, 362 F. Supp. 2d at 330 ("EPA argues that, at the very least, CERCLA is constitutional in emergency situations").

delaying response actions at a site.

          a.      <u>EPA Does Not Use UAOs to Address Environmental Emergencies</u>.

It is undisputed that Section 106 of CERCLA expressly limited EPA's authority to issue UAOs to cases of "imminent and substantial endangerment to public health or welfare or the environment."  *See* 42 U.S.C. § 9606(a).  EPA's pattern and practice, however, has effectively written that requirement out of the statute.  EPA flatly rejects the assertion that UAOs may be used only in cases of environmental emergency.  SUF ¶ 37.  Instead, EPA maintains as a matter of pattern and practice that *every* site listed on the National Priorities List ("NPL")[12] meets the statutory standard of imminent and substantial endangerment.  SUF ¶ 41; *see also* SUF ¶ 42.  Indeed, EPA's pattern and practice is *not* to issue UAOs in cases of emergency.  Rather, in emergency situations EPA funds response actions itself and pursues PRPs for cost recovery thereafter.  SUF ¶ 38 ("in the context of an emergency, we probably wouldn't issue any kind of an order. … We would use the fund to take the immediate action and then we would negotiate after that.").

That EPA does not use UAOs for emergencies is demonstrated by data in EPA's CERCLIS database as to the timing of UAOs.  UAOs are not issued promptly upon EPA discovery of a Superfund site.  Rather, they are issued on average nearly 8 years after EPA has identified site contamination.  SUF ¶ 39.  Even after EPA has established a firm understanding of site conditions, it typically waits years before issuing a UAO.  *See* SUF ¶ 40 (EPA waits on average 8 years after an NPL listing, 5 years after sending out notice letters, and 4 years after selecting a response action in a record of decision ("ROD"), to issue a remediation UAO).

---

[12] The NPL is the list of hazardous waste sites in the United States eligible for long-term remedial action financed under the Superfund program.  *See* 42 U.S.C. § 9605(a)(8).  As EPA

The CERCLIS data on the timing of UAOs establishes that EPA staff is driven not by environmental emergencies but by the need to get UAOs on the books for purposes of internal personnel and regional reviews.  EPA personnel are evaluated on a fiscal calendar basis, with a year end of September 30.  SUF ¶ 49.  One key factor in personnel evaluations is what is colloquially known at EPA as "bean counting," that is, a periodic quantification of a variety of Superfund accomplishments compared to prior year targets.  SUF ¶¶ 48, 52.  EPA tracks and provides credit for the issuance of UAOs as part of its bean counting practice, and these bean counts can have significant consequences not only in the performance evaluation of individual EPA staff but for regional offices as a whole, whose annual budget allocation may be affected by the bean counting results.  SUF ¶¶ 53-56.  The CERCLIS data leave no doubt that bean counting plays a central role in the decisions whether and when to issue UAOs.  UAOs spike dramatically in the days preceding the end of the fiscal mid-year, fiscal third quarter, and fiscal year, with the UAOs issued in the last three days of March, June, and September amounting to a full 25% of the costs of all UAOs issued throughout the year.  The biggest of these spikes comes at year-end: since May 1982, EPA has issued roughly 10% of all UAOs in the last three days of its fiscal year, with estimated costs in excess of $570 million.  In fact, the estimated costs of UAOs issued on September 28, 29, and 30 exceed those of UAOs issued in the entire months of January, February, April, May, July, August, October, November or December.  SUF ¶¶ 50-51.

One notable example of EPA's attempt to use a UAO at a site without any imminent and substantial endangerment can be found at the Palmerton Zinc Pile Site.  Krablin Decl. at ¶¶ 4-14, 28.  On November 17, 1999, EPA issued a UAO to Horsehead Industries requiring it to revegetate 1,000 acres of a mountain that had been denuded 20 years or more before the UAO's

has acknowledged, "placing a site on the NPL" does not "mean that any remedial or removal

issuance by zinc smelting operations that had been conducted by a different company from 1898 to 1980.  *Id.* at ¶¶ 4, 24.  EPA had been well aware of the site conditions since its first investigation of the site in 1979, and there had not been any material change in those conditions in the 20 years prior to the issuance of the UAO, let alone an incipient environmental emergency. *Id.* at ¶ 28.  EPA issued the UAO because Horsehead – which had previously revegetated separate property it owned at the site under a consent decree – had been released by EPA from any other obligations at the site and, accordingly, would not agree to conduct this second revegetation action voluntarily.  *Id.*  at ¶¶ 15-18.  EPA's UAO gambit failed because the agency had brought a separate cost recovery action at the site, which provided Horsehead Industries the ability to seek judicial review of the UAO.  At the urging of the Court, EPA withdrew the UAO. *Id.* ¶¶ 29- 31.

GE suffered a similar experience at its Rome, Georgia site.  GE has been engaged in remediation activities at the Rome site for more than 30 years, the past 20 years of which pursuant to a RCRA permit issued by the Georgia Environmental Protection Department ("GAEPD").  McAlister Decl. at ¶¶ 105-120.  Over the course of those 30 years, GE has spent in excess of $40 million in cooperative efforts with GAEPD to extensively investigate and remediate contaminants arising from the historical operations of a GE electrical transformer manufacturing facility.  *Id.*  In 2002-2003, EPA became involved in discussions with GAEPD and GE regarding a corrective action plan for some neighboring commercial properties.  *Id.* ¶ 121.  On February 20, 2003, GE and GAEPD reached agreement on the terms of a $20 million corrective action plan, and GAEPD advised EPA that the plan was fully protective of public health and the environment.  *Id.* ¶¶ 126-27, 132.  On June 11, 2003, however, without any notice

action necessarily need be taken."  65 Fed. Reg. 46,096, 46,097 (July 27, 2000).

to GE or GAEPD or any change in site conditions, EPA issued GE a UAO that not only effectively precluded GE and GAEPD from proceeding with the agreed-upon corrective action plan, but required GE to repeat years of testing that GE and GAEPD had already conducted at the site. *Id.* ¶¶ 134-35, 140. As written, EPA's UAO would have delayed planned remediation activities at the site by as much as ten years. *Id.* ¶¶ 138-142. With GAEPD's assistance, and with the threat of potential judicial review of the UAO under its RCRA permit (review not available under CERCLA), GE ultimately persuaded EPA to withdraw the UAO. *Id.* ¶¶ 146 & 148. In exchange, GE agreed to some $5 million in additional testing to buy peace with EPA. *Id.* ¶ 150. That testing, which itself delayed remedial action at the site for nearly three years, added absolutely nothing material to the parties' knowledge of the site and did not result in any material change to the corrective action plan to which GE and GAEPD had previously agreed. *Id.*

Contrary to EPA's language-nullifying pattern and practice, many courts have correctly recognized that they "must … give meaning to 'imminent and substantial,'" *A&W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1113 (9th Cir. 1988). These courts have explained that the power granted EPA under CERCLA Section 106 "applies only in emergency situations." *Outboard Marine Corp. v. Thomas*, 773 F.2d 883, 890 (7th Cir. 1985), *vacated on other grounds*, 479 U.S. 1002 (1986). As the Seventh Circuit explained, "[t]he EPA would read out [of Section 106] the emergency precondition and seek the same power for its lesser, nonemergency functions, a power which Congress nowhere in the statute bestows upon them. The EPA's powers were circumscribed by a discriminating Congress." *Id.*; *see United States v. Wade*, 546 F. Supp. 785, 794 (E.D. Pa. 1982) ("A straightforward reading of the language

requires that I conclude that Congress intended Section 106(a) to be used in emergency situations").[13]

But EPA's pattern and practice disregards the judicial interpretations of "imminent and substantial endangerment" that would impose limits on its exercise of its UAO authority.  Thus, for example, although this Court has held that "in order to establish 'imminence,' [EPA] must prove that the risk of threatened harm is *currently* present on the Site, and that the potential for harm is great,'" *Foster v. United States*, 922 F. Supp. 642, 661 (D.D.C. 1996), EPA instead maintains that it need not prove that there is any such current risk of threatened harm.  SUF ¶¶ 43-44.[14]  *See also Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485-86 (1996) ("[a]n endangerment can only be 'imminent' if it 'threaten[s] to occur immediately'").  EPA likewise rejects this Court's holding that "for an imminent and substantial endangerment to exist … there must be a population at risk."  *Compare Foster*, 922 F. Supp. 2d at 661 (*quoting Price v. U.S. Navy*, 818 F. Supp. 1323, 1325 (S.D. Cal. 1992)) *with* SUF ¶ 45.  Not surprisingly, after having rendered the

---

[13] *See Acme Printing Ink Co. v. Menard, Inc.*, 812 F. Supp. 1498, 1507 (E.D. Wis. 1992) (distinguishing potential Congressional interest in avoiding delay under UAO as compared with CERCLA consent decree because "[Section] 106 … describe[s] emergency executive orders"); *United States v. Fairchild Indus., Inc.*, 766 F. Supp. 405 (D. Md. 1991) (EPA action under CERCLA Section 107 discussed in "contrast to the emergency abatement provision of § 106 which by its terms requires proof of imminent and substantial endangerment before action may be taken"); *United States v. Ne. Pharm. & Chem. Co.*, 579 F. Supp. 823, 839 n.17 (W.D. Mo. 1984) ("Section 106(a) is an emergency provision, not a general cleanup provision."), *aff'd in part, denied in part on other grounds*, 810 F.2d 726 (8th Cir. 1986); s*ee also Tenn. Valley Auth. v. Whitman*, 336 F.3d 1236, 1249 (11th Cir. 2003) ("Congress enabled the EPA to issue [Section 7603 Clean Air Act] orders with the status of law, but only in an extremely narrow context. There must be an emergency rising to the point of an 'imminent and substantial endangerment'").

[14] Although *Foster* involved interpretation of the "imminent and substantial endangerment" language in the RCRA statute, courts have repeatedly held that the interpretation of that phrase in RCRA provides guidance as to the meaning of the same phrase in CERCLA Section 106. *See*, *e.g.*, *Northeastern Pharm.*, 579 F. Supp. at 846.  EPA agrees.  Doyle Dep. at 42-43.

statutory phrase a nullity, EPA advises Superfund attorneys in training that it is "relatively easy" to support an imminent and substantial endangerment finding.  SUF ¶ 47.

Having rejected any linkage between UAOs and environmental emergencies, EPA cannot claim a government interest in addressing an environmental emergency to justify denying PRPs of a meaningful pre-deprivation hearing.

> **b.**   EPA's Actual Purpose in Using UAOs Rather than Other Cleanup Options Is to Avoid Judicial Review and Coerce PRPs Into Accepting EPA's Terms for Settlement.

Instead of limiting UAOs to emergency situations EPA has pointedly promoted the use of UAOs where there is no "special need for very prompt action."  *Calero-Toledo*, 416 U.S. at 678. The undisputed record demonstrates that EPA has exercised its UAO authority to avoid judicial review and to force PRPs to accept EPA settlement terms.  The genesis of EPA's current pattern and practice in the use of UAOs dates back to the late 1980s and early 1990s when EPA was faced with two perceived "problems":  First, courts were repeatedly rejecting EPA-selected remedies in cases where those remedies were subjected to meaningful review.  Second, PRPs were balking at the onerous terms of the model settlement consent decree that EPA was seeking to impose on PRPs.  EPA's answer to both problems was the same:  increased use (and misuse) of UAOs.

EPA's experience with direct judicial actions in the late 1980s and early 1990s demonstrates that when district courts have the opportunity to provide meaningful review, EPA's selected remedy is often rejected.  In *United States v. Hardage*, 663 F. Supp. 1280 (W.D. Okla. 1987), for example, the district court held that where EPA seeks direct injunctive relief under Section 106(a), the court will subject EPA's requested remedy to *de novo* review and will not limit a PRP's challenge to the selected remedy to the administrative record.  In a subsequent

opinion, the court rejected EPA's proposed excavation remedy and adopted instead the PRP's proposed containment remedy.  *United States v. Hardage*, 750 F. Supp. 1460 (W.D. Okla. 1990), *aff'd in part, rev'd in part on other grounds*, 982 F.2d 1436 (10th Cir. 1992).  In *United States v. Ottati & Goss, Inc.,* 900 F.2d 429 (1st Cir. 1990), the First Circuit agreed with *Hardage*, likewise rejecting EPA's argument that its selection of remedies in a Section 106 injunction action should be subject only to the lesser arbitrary and capricious standard.  The First Circuit then upheld a district court ruling that, *inter alia*, rejected EPA's selected remedies for the cleanup of metals and PCBs and remanded for further review of EPA's proposed remedy for volatile organic compounds (VOCs).  *Id.*, at 436-42.

Such holdings heralded a sea change at EPA known euphemistically as "enforcement first," whereby EPA avoided the district court review that is part of Section 106 judicial actions and instead began issuing UAOs at every site at which PRPs would not agree to enter into a consent decree.  *See Guidance on CERCLA Section 106(a) Unilateral Administrative Orders for Remedial Design and Remedial Actions* (March 13, 1990).  In consequence, EPA has not been a plaintiff in a district court under Section 106 since the late 1980s.  SUF ¶ 65.  The agency admits it has followed this course precisely to avoid judicial review that had provided PRPs with a meaningful opportunity to challenge – and to secure appropriate changes to – EPA-selected remedies in *Hardage* and *Ottati & Goss*.  SUF ¶ 66.  As EPA warns its Superfund attorneys, "once you sue a PRP they can challenge a remedy."  SUF ¶ 67.  With UAOs, EPA can avoid such challenges.  In short, having had its errors set aside, EPA adopted a pattern and practice to avoid district court hearings at which its decisions could be questioned.

Shortly after thus launching "enforcement first," EPA endorsed a second pattern and practice that has defined its use of UAOs ever since:  the use of UAOs as a hammer to force

PRPs to agree to the terms in EPA's model consent decree.  In the early 1990s, EPA developed

the model consent decree for use at all Superfund sites.  This model consent decree contained

many provisions that PRPs considered objectionable, and EPA was quickly faced with the

question how to respond to these PRP concerns.  EPA decided on a pattern and practice of

increasing the burdens imposed by UAOs – and exploiting PRPs' inability to challenge UAO

requirements – so as to pressure PRPs into abandoning their consent decree objections.

In January 1992, a group of Superfund attorneys from each of the regional offices and

from headquarters (the "UAO workgroup"), issued a memorandum to the top enforcement

officials at EPA proposing that EPA use its unilateral control over UAO requirements to compel

PRP cooperation:  "It has come to this Workgroup's attention that some members of the PRP

community have indicated that they are unhappy with the terms of the recently issued model

CERCLA Remedial Design/Remedial Action Consent Decree.  … *This memorandum seeks to*

*outline recommendations for methods by which PRPs can be encouraged to choose the model*

*consent decree by making the UAO an unattractive alternative*."  *The Use of Unilateral*

*Administrative Order and other Alternatives to Address Unsuccessful CERCLA RD/RA Consent*

*Decree Negotiations* at 7 (Jan. 17, 1992) (Ex. F to Lasker Decl.) (emphasis added).

Thereafter, EPA embarked on a deliberate campaign to make UAOs more onerous – not

in response to environmental conditions at a site but to coerce PRPs to enter into EPA's model

consent decree.  SUF ¶ 74.  EPA's general direction to Superfund attorneys is to make the terms

of UAOs "ugly, onerous, and tough" and to "make settlements more attractive by making the

alternatives what PRPs want least, very unpleasant."  SUF ¶ 75.  Superfund attorneys are

instructed to make clear to PRPs that if they fail to agree to the model decree, EPA will issue a

UAO withdrawing positions the agency had taken in prior discussions about response actions

that would protect public health and the environment and instead imposing more stringent

requirements.  SUF ¶ 76.  Superfund attorneys are also instructed that a statement of work

regarding required response actions "should not be negotiated in a UAO, but can be used to

threaten" and that PRPs should be told that they will face more stringent work schedules under a

UAO than under a consent decree.  SUF ¶¶ 77, 79.  Further, Superfund attorneys are told to force

a settlement of a large group of PRPs by threatening to target some but not all of them with a

UAO, *i.e.*, to say to them "Let's play Russian Roulette" and "Do you feel lucky?"  SUF ¶ 75.

And Superfund attorneys are directed to threaten PRPs with the issuance of a UAO to coerce

them into entering into consent decrees even in circumstances where EPA has internally made

the decision that it will not issue a UAO at all.  SUF ¶ 80.[15]  This undisputed evidence of EPA

pattern and practice further illustrates the degree to which EPA has departed from the facial

terms of the CERCLA statute.

---

[15] In addition, EPA has politicized its Section 106 UAO policy through its treatment of federal
PRPs.  The federal government is the largest PRP in the country.  As of June 2005, for example,
the Department of Defense had identified approximately 6,000 former or current military
facilities that require remediation of improperly disposed hazardous wastes and substances. *See*
Gen. Accounting Office, *Groundwater Contamination: DOD Uses and Develops a Range of
Remediation to Cleanup Military Sites* (No. 05-666, June 2005).  However, EPA's pattern and
practice is to issue UAOs against private PRPs only, and not against federal PRPs.  EPA has
issued only one UAO to a federal PRP (and that with the government's consent).  SUF ¶ 100.
Further, EPA routinely shares "enforcement-sensitive" materials with federal PRPs, and trains its
Superfund attorneys to protect federal PRPs against contribution claims from private PRPs.  SUF
¶¶ 102, 103 ("it is really important when there's a federal PRP that the private PRP waives their
claims against the United States").  Such preferential treatment of the nation's most significant
PRP belies any suggestion that the issuance of UAOs is related to genuine environmental risks,
*see also* Baker Decl. at ¶¶ 9-11, and raises the appearance, if not actuality, of improper self-
dealing.  *See Atl. Research Corp. v. United States*, 459 F.3d 827, 837 (8th Cir. 2006), *aff'd*, 127
S. Ct. 2331 (2007). (discussing "absurd and unjust results" if the government could "eviscerate
CERCLA whenever the government, itself, was partially responsible for a site's contamination.

c.      A Hearing Would Not Unduly Delay Superfund Cleanups.

The fact that UAOs are not used to respond to environmental emergencies undercuts any argument that pre-deprivation hearings should be disallowed because they would delay Superfund cleanups.  The issuance of a UAO does not signal either the need for or the likelihood of an immediate response action.  As noted above, EPA spends years at a site before issuing a UAO, including an average four-year delay after it has selected what it considers the appropriate remedy.  SUF ¶ 40.  Moreover, this lag-time in issuance has grown over the years as UAOs have become increasingly decoupled from conditions at the site.  The CERCLIS database reveals a consistent trend towards longer issuance lag-times, from less than 8 years after site identification in the early 1990s to more than 14 years in 2002.  SUF ¶ 39.  Nor does the timing of UAO issuance reflect any EPA determination that there has been a sudden change in conditions at the site; rather, EPA times the issuance of UAOs based on internal bean counting considerations.  The undisputed evidence thus disproves any suggestion that allowing time for a hearing would give rise to an environmental risk.

In addition, even after a UAO is issued, there is further ample time in which a prompt and meaningful hearing could be conducted without interfering with the remedy.  The average UAO lasts more than three years, with remediation UAOs lasting on average nearly 5 years.  SUF ¶ 82.  Again, the historical trends revealed in the CERCLIS database demonstrate the increased lack of emergency at these sites.  The duration of UAOs has consistently increased over the years, from an average of approximately 2.5 years in 1984 to nearly 6 years in 2001.  SUF ¶ 83.  This trend parallels other trends in the data showing that UAOs are increasingly used for remediations rather than for removals, and for actions designated by EPA itself as non-time critical.  SUF ¶ 84.

EPA cannot identify a government interest in very prompt action sufficient to justify avoiding a pre-deprivation hearing prior to issuance of a UAO.  Thus, the first factor in the *Mathews* three-part balancing test weighs heavily in favor of an immediate due process hearing.

> 2.   PRPs Have a Significant Private Interest in Securing a Pre-Deprivation Hearing

The private interest of PRPs also weighs heavily in favor of a pre-deprivation hearing. *Mathews* explains that "the degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decisionmaking process."  424 U.S. at 341.  As detailed in Section I-A above, the potential deprivation here is significant.

All told, EPA issued UAOs between August 16, 1982 and May 25, 2006 with a total EPA-estimated cost to PRPs of more than $5.5 billion.  SUF ¶ 2.  On average, a PRP that receives a UAO can expect to pay $4.4 million before that UAO is completed, with removal UAOs costing an average of $1.3 million and remediation UAOs costing an average of $9.2 million.  *Id*.  These costs have risen steadily over time, increasing from approximately $1 million per UAO in the mid 1980s to more than $11 million in 2005.  SUF ¶ 73.  Drs. Siegel, Geweke, and Johnston explained how the deprivations suffered by a PRP that elects not to comply with a UAO can be even more substantial.  *See* SUF ¶¶ 3, 4, 11, 12, 22, 28-32, 33.

The private interest here is compounded by the long delay before a PRP can obtain judicial review of a UAO.  In addition to the degree of deprivation, "the possible length of wrongful deprivation of … benefits (also) is an important factor in assessing the impact of official action on the private interests."  *Mathews*, 424 U.S. at 341.  In *Reardon*, the First Circuit in analogous circumstances explained that this factor weighed heavily in favor of pre-deprivation review of EPA decisions to issue liens to PRPs for Superfund liability:

> The first hearing the property owner is likely to get is at the enforcement proceeding, or the cost recovery action, brought by EPA.  … Since the government may take its own sweet time before suing, and since the removal or remedial action may itself take years to complete, the lien may be in place for a considerable time without an opportunity for a hearing.  …  Indeed, in this respect the CERCLA scheme resembles the replevin statutes in *Fuentes v. Shevin*, where the Court held that a debtor may not be "left in limbo to await a hearing that might or might not 'eventually' occur."  *Mitchell v. W.T. Grant Co.*, 416 U.S. at 618, 94 S.Ct. at 1905 (discussing *Fuentes v. Shevin*).

947 F.2d at 1519-20.  PRPs who receive UAOs are similarly "left in limbo" awaiting the completion of UAO response actions that last three years on average and that can extend as long as thirty years.  SUF ¶¶ 81-83, 93.

EPA itself has recognized that the long duration of UAOs makes the availability of post-completion review an unattractive option, SUF ¶¶ 154-158, and it has adopted patterns and practices to make PRPs wait even longer.  Although Section 106(b) of CERCLA provides that a PRP may file a petition for reimbursement of UAO costs with EPA's Environmental Appeals Board ("EAB") upon completion of a UAO, EPA takes the position that a UAO is not "completed" until EPA says it is, a position that has been upheld by the EAB.  SUF ¶ 91.  EPA also has intentionally avoided providing any guidance to PRPs on the meaning of "completion," so as to provide it with maximum flexibility to define the term to delay a PRP's ability to file a Section 106(b) petition.  SUF ¶¶ 86-87.  EPA's pattern and practice in this regard is highlighted in a series of candid internal emails in the early 2000s in which EPA personnel discussed the definition of "completion":  "[the term] is meant to be ambiguous and the government should use whatever definition is to their advantage"; "pick the [definition] most advantageous to the agency without looking unreasonable."  SUF ¶ 88.

EPA also has adopted a policy of including "additional work" provisions in UAOs.

These provisions allow EPA to prolong the pendency of a UAO by requiring PRPs to conduct additional work not included in the original UAO.  SUF ¶ 94.  EPA does not have any policy or guideline that imposes any limit on the number of sequential modifications that EPA may thus impose under a UAO.  SUF ¶ 95.  Nor does EPA require a separate finding of an "imminent and substantial endangerment" to justify further work added to the requirements of a UAO.  SUF ¶ 96.  But until this additional work is deemed completed by EPA as well, the PRP remains in no-hearing limbo.

EPA's pattern and practice of delaying a PRP's ability to file a Section 106(b) petition is demonstrated by the experience of Canadyne Georgia Corporation ("CGC") at the Woolfolk Chemical Works Site ("WCWS").  *See* Uyesato Decl. ¶¶ 3-32.  On December 1, 1993, EPA issued CGC a UAO requiring it to conduct a one-year removal action at WCWS, over objections from CGC that, *inter alia*, the site did not pose an imminent and substantial endangerment.  *Id.* at ¶¶ 6-10.  Before the year was out, however, and continuing for a number of years thereafter, EPA extended the duration of the UAO by imposing new requirements under the UAO's "additional works" provision.  *Id.* at ¶¶ 11-15.  By September 1999, CGC completed all of the additional work required by EPA, but then was forced to embark on a four-year campaign to secure from EPA a certificate of completion necessary for it to file its reimbursement petition.  *Id.* at ¶¶ 17-30.  This campaign included a nearly two-year period during which CGC sent five different letters asking EPA for a certificate of completion without any response.  *Id.* ¶¶ 17-22.  This delay proved uncomfortable even to EPA's project manager at the site, who in an internal handwritten note annotated to the fourth CGC entreaty wrote "We need to respond to them!"  *Id.* at ¶ 20.  EPA did not provide CGC with a certificate of completion until after the agency had

filed its own cost recovery action, through which it was able to pressure CGC into a comprehensive settlement. *Id.* at ¶ 27-32.

EPA is pursuing similar tactics against Raytheon Aircraft Company at the Herington Army Airfield Site ("HAAF"). *See* Baker Decl. ¶¶ 3-33. EPA issued a UAO to Raytheon on September 30, 2004, requiring Raytheon alone to conduct a removal action for TCE contamination, despite Raytheon's showing in repeated prior meetings with EPA that the contamination had in fact been caused by the United States Army Air Force during World War II. *Id.* at ¶¶ 4-9. Upon completion of the work required under the UAO, Raytheon filed on January 3, 2006, a Section 106(b) petition seeking reimbursement of its UAO costs. *Id.* at ¶ 19. EPA moved to dismiss the petition, arguing not that the work required under the UAO was incomplete but that the agency had not provided Raytheon with the required "certificate of completion." *Id.* at ¶ 20. This motion precipitated a round of briefing after which, on May 22, 2006, the EAB ordered EPA to provide a status report explaining why it had not provided Raytheon with a certificate of completion. *Id.* at ¶¶ 20-23. EPA delayed another 3½ months before finally issuing the certificate of completion on September 6, 2006. *Id.* at ¶¶ 24-26. EPA then, however, took another tack, arguing that EAB should stay proceedings on the Section 106(b) petition because one of the issues to be addressed under the petition (whether Raytheon was in fact a liable party at the site) was also at issue in a separate cost recovery action that had been filed by EPA. *Id.* at ¶ 27. EAB granted EPA's motion over Raytheon's objection. *Id.* at ¶ 28. Accordingly, nearly two years after it had completed work and filed its petition, Raytheon still cannot obtain Section 106(b) review.[16] *Id.* at ¶ 29.

---

[16] GE faced a similar, albeit less prolonged, situation at its Grand Street Mercury Site, where EPA likewise was initially successful in persuading EAB to dismiss GE's Section 106(b) petition

The significant costs of UAOs and long delays in any opportunity for review – both exacerbated by EPA pattern and practice – establish the substantial private interest in securing pre-deprivation hearings upon issuance of a UAO.

        3.      <u>A Pre-Deprivation Hearing Would Ameliorate a Significant Risk of Error.</u>

The third and final factor to be considered under *Mathews* "is the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards." 424 U.S. at 343. In assessing this factor, the Court need not find that EPA *always* errs in its issuance of UAOs, nor that a hearing would *always* fix EPA errors. Rather, the Court must consider the *risk of error* and the potential value of pre-deprivation review. "[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Id.* at 344.

One key factor in determining the value of due process review to address the risk of error is the complexity of the EPA decisions in issuing UAOs. Are these "uncomplicated matters that lend themselves to documentary proof," *Mitchell v. W.T Grant Co.*, 416 U.S. 600, 609 (1974), thereby minimizing the danger of mistakes in the issuance of UAOs? Or are the issues "highly factual?" *Doehr*, 501 U.S. at 8; *see also Reardon*, 947 F.2d at 1519. There can be no question that UAOs fall on the "highly factual" side, with consonant increased risk of error. EPA decisions as to PRP liability involve individualized review of documents and witness recollections dating back decades and a matching of site contaminants identified through sophisticated scientific testing with the PRP's historical activities. EPA selection of remedies involves highly technical analyses of site conditions, remediation technologies, and potential site

---

in part because the agency had not – despite completion of work at the site – issued a certificate of completion for one of the UAOs at issue. McAlister Decl. ¶ 49.

risks.   The possibilities of error in these decisions are multifold, as demonstrated by *Hardage* and *Ottati & Goss*, discussed *supra*.

Another factor increasing the risk of error is that EPA bases its decision to issue a UAO solely on its own unilateral determination whether the order is appropriate.  The Supreme Court has long recognized that such *ex parte* or unilateral government action raises a grave risk of error and attendant due process problems.  *See, e.g., Doehr*, 501 U.S. at 13 (risk of error too great even where judge reviewed complaint and affidavit prior to attachment because there was no independent review of "one-sided, self-serving and conclusory submissions"); *North Georgia Finishing, Inc. v. Di-Chem, Inc*., 419 U.S. 601 (1975 (*ex parte* garnishment statute violates Due Process Clause); *Sniadach v. Family Fin. Corp.*, 395 U.S. 337 (1969) (prejudgment garnishment of wages without prior notice violates Due Process Clause); *Fuentes*, 407 U.S. at 70-71 (*ex parte* replevin scheme violates due process).

Thus, in *United States v. James Daniel Good Real Property*, the Supreme Court held that allowing the government to effect a deprivation of property via an *ex parte* probable cause hearing before a neutral magistrate – a greater protection than that afforded by § 106 – nonetheless suffered from an unacceptably high risk of error.  *See* 510 U.S. at 58-59.  "[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it."  *Id.* at 55 (internal citation omitted).  Highlighting the role of an adversary hearing in ensuring the "requisite neutrality that must inform all governmental decisionmaking," the Court posited: "That protection is of particular importance here, where the Government has a direct pecuniary interest in the outcome of the

proceeding. . . . '[I]t makes sense to scrutinize governmental action more closely when the State stands to benefit.'"  *Id.* at 55-56 (citation omitted).

The same principle applies here.  Not only is EPA the sole decisionmaker in issuing UAOs, but EPA has through its pattern and practice sought to cut off even the most minimal opportunity for oversight that might at least identify a UAO's most glaring errors.  Since the 1980s, EPA has increasingly delegated its UAO authority away from EPA headquarters and down the chain of command at its regional offices.  SUF ¶¶ 117, 118.  Although EPA policy requires consultation with headquarters on certain actions taken by regional offices in connection with settlement discussions with PRPs, that policy is largely honored in the breach.  SUF ¶ 122.  Consistent with its general "enforcement first" bent, moreover, EPA has focused what consultation requirements still exist solely on EPA personnel who exercise their discretion *not* to issue UAOs or *not* to seek the maximum penalties for alleged UAO noncompliance – thereby encouraging EPA officials to use UAOs in as coercive a manner as possible.  SUF ¶ 119.[17]

Contemporaneous with its launch of "enforcement first" in 1990, EPA also sharply curtailed the procedures it follows in "UAO conferences" with PRPs after issuance of the UAO. SUF ¶ 144.  Since 1990, EPA policy has been explicit that the only purpose of a UAO conference is to discuss implementation of the order; EPA will not consider PRP arguments regarding liability, the lawfulness of the remedy, or whether the UAO should have been issued *vel non*.  SUF ¶ 145.  EPA also abolished its prior procedures of assigning a presiding officer to

---

[17] Such risk of error is plainly evidence at the Rome, Georgia site discussed *supra*, where EPA staff personnel, with apparent limited oversight, issued a UAO that would have set back by as much as a decade $20 million in remedial action agreed to under RCRA by GE and the responsible Georgia state regulators.  *See* McAlister Decl. ¶¶ 99-151.

the UAO conference, and EPA policy now provides that a UAO conference is not an evidentiary hearing. SUF ¶¶ 146-148. On their face these measures are designed to keep EPA personnel from engaging in any factual review based on the PRPs' knowledge of the matter. This must inevitably increase the risk of error.

While the nature of EPA's unilateral decision-making alone provides sufficient proof of risk of error, an extensive analysis conducted for EPA of its remedy selections at individual Superfund sites dramatically highlights the mistakes that have followed from the lack of any meaningful third party review of EPA's decisions. In the mid-1990s, EPA retained Kip Viscusi, Ph.D. to study the cost-effectiveness of EPA-selected remedies at Superfund sites, based on EPA's own assessment of the remedial costs and site risks. Dr. Viscusi's analysis was conducted over a six-year period and focused on 150 nonfederal Superfund Sites as to which EPA had site-specific risk data. His findings resulted in a series of peer-reviewed articles in the leading journals in the field, including the *American Economic Review* and the *Review of Economics and Statistics*, as well as a peer-reviewed book, *Calculating Risks: The Spatial and Political Dimension of Hazardous Waste Policy* (Cambridge Press 1999). SUF ¶ 115; *See generally* Viscusi Report. The accuracy and reliability of these findings have never been disputed in any peer-reviewed literature. SUF ¶ 116.

Dr. Viscusi documented extraordinary errors in EPA selection of remedies at Superfund sites. EPA's risk assessment practice in selecting remedies focuses on the risk of cancer. SUF ¶ 107. Dr. Viscusi determined that the median cost per case of cancer averted by the site remedies selected by EPA was $388 million, far in excess of the amount generally considered appropriate in other government programs and so high as to lead to a net loss of human life through the diversion of resources from expected alternative health promoting uses. SUF ¶ 108; Viscusi

Rep. ¶¶ 27, 40-44; *see also Int'l Union, UAW v. OSHA*, 938 F.2d 1310, 1326-27 (D.C. Cir. 1991) (Williams, J., concurring) ("Incremental safety regulation reduces incomes and thus may exact a cost in human lives").  Dr. Viscusi noted, moreover, that there were wide discrepancies between individual site remedies:  Although a handful of remedies resulted in reduction in cancer risk at a cost of less than $100,000 per cancer avoided, the cost at roughly one-third of the sites exceeded $1 billion per each cancer avoided, and the cost at another third of the sites was between $100 million and $1 billion.  SUF ¶ 109.  Dr. Viscusi also determined that even these exceedingly high costs were underestimates, because they were based on EPA risk assessments that improperly multiplied a number of different upper bound estimates, thus resulting in an unrealistically high estimate of site risks.  When this error was corrected, and risks assessed based on a single upper bound risk estimate, the median cost per each cancer avoided through EPA-selected remedies at Superfund sites ballooned to $6.4 billion.  SUF ¶¶ 110, 111.[18]

Equally disturbing was Dr. Viscusi's conclusion based on the data that the driving factor behind EPA's selection of remedies was not the environmental condition of a site but rather a series of political and public relations factors.  Dr. Viscusi found that the existence of current risks to exposed populations and EPA's hazard ranking score for the site had no statistically significant impact on either the stringency of the selected remedy or the cost per cancer avoided. SUF ¶ 113.  Rather, the key determinants of cleanup decisions were, *inter alia,* the voting percentage in the county, the number of environmental group members relative to the population in the state, the League of Conservation Voters score for Congressional representatives and the existence of contaminants likely to be highly publicized by the media.  SUF ¶ 114.

---

[18] Dr. Viscusi's findings are thus in accord with then Judge Breyer's conclusion in rejecting EPA's recommended cleanup levels in *Ottati & Goss, Inc.*, that EPA's selected remedy at the site there at issue "amount[ed] to a very high cost for very little extra safety."  900 F.2d at 441.

Such decisions based on factors not identified in CERCLA are illustrated by the Grand Street Artists Site in Hoboken, N.J., where EPA targeted GE with a UAO due to a contamination issue that arose five decades after GE's connection to the property ended. *See* McAlister Decl. ¶¶ 5-50. In 1948, GE sold a mercury vapor lamp factory to a former employee who continued to use it for the same manufacturing purpose. *Id.* at ¶ 8. Some fifty years later, after the factory had passed to yet another industrial user, the owner improperly converted the building into a residential condominium without disclosing the building's former use to state regulators. *Id.* at ¶¶ 9-11. The subsequent condominium owners – who themselves then voted in internal board meetings to conceal the presence of mercury from state regulators – instigated a vicious media and political campaign in which GE was cast as a villain. *Id.* at ¶¶ 12-14, 21-30. The ensuing political pressure apparently dictated EPA's response. Despite GE's complete lack of involvement at the site for fifty years or in the unlawful conversion to residential use by the subsequent owners, and despite the fact that the building still met applicable OSHA regulations for safe industrial use, EPA ordered GE alone to demolish the building at a cost of more than $15.5 million. *Id.* ¶¶ 7, 29, 31-43.

The risk of EPA error is also manifest in EPA's decisions targeting non-liable PRPs for the receipt of UAOs. This risk is starkly illustrated by EPA's decision to issue two UAOs to GE at the site of a former paint manufacturer in Milford, New Hampshire ("Fletcher's Paint Works"). *See* McAlister Decl. ¶¶ 51-98. GE's only involvement with the site was the sale to the former site owner of PCB-containing dielectric fluids that the owner then used in the manufacture of paints and/or resold to third parties (primarily to a manufacturer of roofing materials). *Id.* at ¶¶ 56-64. CERCLA does not impose liability for such sales of useful products, *see*, *e.g.*, *United States v. Wedzeb Enters.*, 844 F. Supp. 1328 (S.D. Ind. 1994), and GE has over

the past dozen or more years repeatedly explained to EPA why it is not a liable party at the site. *Id.* at ¶ 67.  EPA has never responded to any of GE's presentations, however, and based upon testimony of the EPA on-scene coordinator recently given in connection with an EPA cost-recovery action, EPA does not appear to have given these arguments any consideration whatsoever.  *Id.*[19]

Of course, PRP's procedural due process rights do not depend on their establishing that EPA has consistently erred in issuing UAOs.  "It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing."  *Carey v. Piphus*, 453 U.S. 247, 266 (1978) (citations omitted). But the significant risk of error inherent in EPA's pattern and practice of issuing UAOs to avoid judicial review like that provided in *Hardage* and *Ottati & Goss* (or even limited review in UAO conferences) and evident in Dr. Viscusi's review of EPA-selected remedies also weighs heavily in favor of providing PRPs with a pre-deprivation hearing before an impartial adjudicator.

C.    Due Process Thus Requires the Right to a Hearing Before UAOs Can Take Effect.

As the Supreme Court has repeatedly recognized, "the root requirement of the Due Process Clause" is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."  *Loudermill*, 470 U.S. at 542 (citations omitted); *see also James Daniel Good Real Prop.*, 510 U.S. at 55.  "For more than a century the central meaning of procedural due process has been clear:  'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.  'It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a

---

[19] GE's liability at the site is now being litigated in the context of an EPA-filed cost recovery action.

meaningful time and in a meaningful manner.'"  *Fuentes*, 407 U.S. at 80 (*quoting Baldwin v. Hale*, 1 Wall 223, 233, 68 U.S. 223 (1863); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (other citations omitted).  *See also Hamdi v. Rumsfield*, 542 U.S. 507, 533 (2004) (plurality opinion) (due process requires that United States citizen being held as enemy combatant be given meaningful opportunity to be heard to contest factual basis for his detention).

Pursuant to *Mathews*, "[t]he ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness."  424 U.S. at 348.  The existence of deprivation is clear and the *Mathews* balancing test weighs decidedly in GE's favor.  While the Court need not dictate the specific type of hearing that must be provided, the significant private interests and risk of error require that PRPs be provided the right to a constitutionally adequate hearing before the effective date of a UAO.  The undisputed record shows that such relief would not impinge upon any legitimate government interest.

II.    **EPA's Pattern and Practice in Exercise of its UAO Authority Also Violates PRPs' Constitutional Right to Due Process under *Ex parte Young*.**

The coercive effect of EPA's pattern and practice in the use of the UAO penalty scheme raises an independent due process violation under *Ex parte Young* and its progeny.  As the Court recognized in its March 30, 2005 opinion, "a statutory scheme that imposes penalties when one seeks judicial review is unconstitutional if 'the penalties for disobedience are by fines so enormous … as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation.'"  *Johnson*, 362 F. Supp. 2d at 342 (*quoting Ex parte Young*, 209 U.S. at 147).[20]  The Court concluded that as to a facial challenge "[t]he availability of judicial

---

[20] The Supreme Court very recently affirmed the vitality of this well-established principle:  "[W]here threatened action by the government is concerned, we do not require a plaintiff to

discretion in combination with a 'sufficient cause' defense under CERCLA cures any potential constitutional deficiency based on *Ex parte Young*." *Id.*  The Court recognized, however, that GE's concerns regarding the magnitude of potential penalties and EPA's control over the timing of any review "may … warrant development in its pattern and practice case." *Id.* at 343.  The Court noted that, under the "sufficient cause" defense, "a PRP is required to risk potentially millions of dollars in fines and penalties on a speculative judicial decision." *Id.*  In addition, the Court noted GE's argument "that the 'sufficient cause' defense has not been so fully developed in case law as to provide PRPs with any comfort in their ability to meet the standard and avoid escalating penalties." *Id.*

With the benefit of discovery of EPA's pattern and practice, it is now evident that the previously identified infirmities in the "sufficient cause" defense preclude any reliance on that defense as a safe harbor against *Ex parte Young* concerns.  EPA has engaged in patterns and practices that are specifically designed to "intimidate [PRPs] … from resorting to the courts" to test the validity of UAOs.  At the most basic level, the proof of this intimidation is in the pudding:  Despite the fact that EPA has issued some 1,700 UAOs from 1982 to 2006, EPA's CERCLIS database identifies only a handful of sites where EPA was required to bring an enforcement action for UAO noncompliance, and EPA itself concedes that it is very rare for a PRP to elect not to comply with a UAO.  SUF ¶¶ 150, 153.  Indeed, even looking at the broader

expose himself to liability before bringing suit to challenge the basis for the threat.  …  We [do] not require … that the plaintiff bet the farm, so to speak, by taking the violative action." *Medimmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 772 (2007) (citing *Ex parte Young* and other authority); *see also Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1120 (2d Cir. 1975) ('We agree, of course, with the principle enunciated by the Supreme Court … that a right of judicial review is merely 'nominal and illusory' if it must be exercised 'only at the risk of having to pay penalties so great that it is better to yield to orders of uncertain legality rather than to ask for the protection of the law.'") (internal citation omitted).

question of how often PRPs are deemed by EPA to be in noncompliance with any provision of a UAO (which can be as minor as missing a deadline), the CERCLIS database identifies fewer than 200 cases of noncompliance in well over 5,000 PRP-UAO combinations, for a noncompliance rate of only 3.5%.  SUF ¶ 152.[21]  *See also* Ramsey Decl. at ¶ 25.

EPA documents produced in discovery and the testimony of EPA witnesses provide the garnish for this pudding, demonstrating that the intimidation is the result of deliberate EPA pattern and practice.  EPA actively seeks to increase PRP fears of excessive penalties and punitive damages if they fail to comply with UAOs and to undermine any possible reassurance that might be provided by the sufficient cause defense.  That is, EPA has designed its pattern and practice precisely to prevent PRPs from attempting to invoke the sufficient cause defense.

A.    EPA's Pattern and Practice of Issuing UAOs Is Unconstitutionally Coercive.

In considering in its March 2005 opinion whether Section 106 is unconstitutionally coercive, the Court adverted to the possibility that a sufficient cause defense or the prospect of judicial discretion might allow PRPs to risk otherwise excessive penalties and punitive damages and defy a UAO.  Discovery has demonstrated, however, that EPA has pursued patterns and practices designed to dissuade PRPs from running this risk by adding even greater coercive weight to the hammer poised above a PRP's head.

First, as discussed above, EPA has embarked on a deliberate campaign to make UAOs as coercive as possible, increasing both the costs and duration of ordered response actions.  In so doing, EPA has increased both the financial stakes to a PRP considering not to comply with a UAO (through the risk of greater treble damages and longer accumulation of daily penalties) and

---

[21] "Although statistics … are by no means dispositive of due process … they reinforce the value of an inquiry into the probable value, if any, of additional or substitute procedural safeguards." *Faheem-El v. Klincar*, 841 F.2d 712, 726 (7th Cir. 1988).

the *in terrorem* effect of UAOs on PRPs that are at the mercy of EPA with respect to the timing, record, and scope of a future enforcement action.

Second, EPA has eviscerated any PRP hope of leniency in UAO noncompliance penalties. Because EPA has so rarely been required to go to court to enforce a UAO, there is a paucity of judicial authority to provide guidance to PRPs on whether courts might exercise their discretion to soften the hammering blow of penalties and treble damages. PRPs thus can look only to EPA to determine what likelihood there might be in leniency from that direction. The message that EPA has sent to PRPs has been unequivocal: They should expect none. EPA's pattern and practice in bringing suit for UAO noncompliance has been to seek the statutory maximum in penalties and treble damages. SUF ¶ 125. To put this in context, based on CERCLIS data regarding the average duration and cost of UAOs, a PRP considering whether to comply with a UAO can expect a claim for penalties and treble damages exceeding $54 million, with the claim for noncompliance with a remediation UAO exceeding $94 million and the claim for noncompliance with a removal UAO reaching $26 million. SUF ¶ 122.

Third, EPA has adopted the position that it can seek daily penalties beyond the already onerous $32,500 statutory cap. EPA maintains that a PRP can be hit with multiple daily penalties for noncompliance with different obligations under a single UAO. For example, at one site, EPA threatened a PRP with $90 million in multiple penalties for alleged noncompliance with a single UAO during a seventeen-month period, the equivalent of over $175,000 per day. SUF ¶ 133. EPA's Rule 30(b)(6) deponent testified that this approach was "absolutely" consistent with EPA policy. *Id.*

Fourth, EPA has adopted a guidance document for settlement negotiations with PRPs over UAO penalties and punitive damages that is so unyielding that EPA withheld finalizing the

document during the mid-1990s for fear that it would disrupt Congressional debates over Superfund reauthorization.  SUF ¶ 134.  In drafting this guidance, EPA repeatedly resisted the entreaties of DOJ attorneys who warned that the guidance would result in disproportionate penalties.  SUF ¶ 127.  For example, EPA rejected DOJ's request that it agree to a temporal cap on daily penalties.  SUF ¶ 128.  As a result, EPA's pattern and practice gives rise to precisely the timing problem this Court held raised "legitimate concerns."  *Johnson*, 362 F. Supp.2d at 343; *see also Pactiv*, 455 F. Supp.2d at 692 ("Plaintiff has had no hearing and there is no immediate prospect of one.  There is no step that Plaintiff can take to get a hearing.  Pactiv will only get a hearing if and when the government decides to bring a[] court action and the potential liability is growing daily."); *Aminoil, Inc. v. EPA*, 599 F. Supp. 69, 75 (C.D. Cal. 1984) (finding that Section 106(a) likely violates due process under *Ex Parte Young* because, *inter alia*, "parties are left to await an enforcement or recovery action, which may occur at some indefinite time in the future.  In the meantime, daily penalties continue to accrue.").  Pursuant to its pattern and practice, EPA seeks penalties for alleged UAO noncompliance even if EPA does not believe there is any evidence that the noncompliance is willful.  SUF ¶ 130.  EPA also seeks penalties for alleged UAO noncompliance even if EPA does not believe that the site poses an immediate threat to human health or the environment and even if the alleged UAO noncompliance has not resulted in any actual environmental harm.   SUF ¶ 131.

Fifth, "under EPA's civil penalty policy, a PRP's non-compliance with a UAO at any given site immediately and automatically labels that PRP as a 'recalcitrant' actor, causing that firm to be subject to the highest daily civil penalties that are permitted by CERCLA in future site enforcement actions."  Johnston Report ¶ 5; *see also* SUF ¶ 132.  EPA also capitalizes on the

danger that a UAO's finding of "imminent and substantial endangerment" may increase a PRP's potential civil liability:

> EPA has emphasized that the potential for its "imminent and substantial endangerment" finding (a statutory precondition for issuance of a UAO) to be used in later toxic tort litigation makes the threat of an "order containing such a finding . . . an extremely potent threat . . . ."

Johnston Report ¶ 5 (internal quotation marks and ellipses in original).

Dr. Geweke's analysis of the likely financial consequences to a PRP that elects not to comply with UAOs provides a chilling further confirmation of EPA's warning that a PRP that relies on a sufficient cause defense does so at its peril. Among the firms in his analysis, noncompliance with UAOs would have driven over 7 percent of PRPs into bankruptcy and would have cut the market value of an additional 7.6 percent by at least one-half. Geweke Report ¶¶ 186, 187. Across all firms, the decision would have resulted in a nearly 10% drop in market value. *Id.* ¶ 188. On the financing front, nearly 7 percent would experience an increased cost equivalent to a down grading from investment to junk bond status and more than one-third of firms would experience at least a one-grade reduction in their investment rating. *Id.* ¶ 189.

B. **EPA's Pattern and Practice Renders the Sufficient Cause Defense Constitutionally Inadequate Because It Denies PRPs Any Guidance as to the Meaning of the Defense.**

In addition to increasing the coercive impact of UAOs, EPA has taken affirmative steps to prevent the "sufficient cause" defense from serving as an adequate constitutional safeguard. EPA's pattern and practice guarantees that the "sufficient cause" defense is amorphous and poorly defined and that PRPs cannot accurately predict what type of conduct it protects.[22]

---

[22] Courts have long acknowledged that individuals should not be penalized for their inability to predict how a court might rule on a particular issue – especially where that issue turns on the application of an imprecise or unsettled legal standard. *See, e.g., Mo. Pac. Ry. Co. v. Nebraska,*

In *Solid State Circuits, Inc. v. EPA*, 812 F.2d 383 (8th Cir. 1987), the Eighth Circuit addressed the question whether the "sufficient cause" defense was adequate to avoid the *Ex parte Young* problems raised by the UAO penalty scheme.  The Eighth Circuit opined that, "to pass constitutional requirements, the standard must provide parties served with EPA clean-up orders a *real and meaningful opportunity* to test the validity of the order."  *Id.* at 391.  The court held that the constitutional adequacy of the sufficient cause defense turned on the ability of a PRP to reach a reasoned conclusion as to what the defense meant and when it would apply:

> We note … that in some instances, CERCLA itself is silent or ambiguous, and the EPA has failed to promulgate regulations or to issue position statements that could allow a party to weigh in advance the probability that the clean-up order is valid or applicable.  Absent such guidance, it will also be difficult for a court to determine the reasonableness of a challenge to the order notwithstanding the presumption of validity an agency order enjoys.

*Id.* at 392.

In light of the then relatively recent enactment of CERCLA, the Eighth Circuit upheld the statute on the assumption that such guidance would be forthcoming.  *Id.* at 392 n.11 ("absent a more fully developed record, we will not engage in the delicate matter of finally construing the statute; instead, we assume that in the future the EPA and the courts will construe the statute in a constitutional manner").  The court ended its opinion, however, with an unambiguous call on EPA to provide the type of guidance necessary to provide the sufficient cause defense with the requisite certainty:

> [W]e hold that if neither CERCLA nor applicable EPA regulations or policy statements provides the challenging party with

---

217 U.S. 196, 207 (1910); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 137-38 (3d Cir. 2000) ("[i]t is constitutionally impermissible to force a physician to guess at the meaning of" ambiguous terms in an abortion statute and thereby "risk losing his or her professional license and receiving a heavy fine if he or she guesses wrong").

meaningful guidance as to the validity or applicability of the EPA order, *Ex parte Young* and its progeny require that the burden rest with the EPA to show that the challenging party lacked an objectionably reasonable belief in the validity or applicability of a clean-up order.

Although shifting the burden may seem onerous, we agree with the *Wagner Electric* court that the EPA could greatly limit sufficient cause defenses by issuing regulations and policy statements and by providing for informal hearings that would enable a party to better determine the validity and applicability of an EPA order prior to the time it must decide whether to comply with the clean-up order or risk treble damages. By providing such guidance at an early stage, the EPA will best protect the interests of all concerned and promote faster more efficient clean-ups while making certain liability for clean-ups remains with those responsible.

*Id.* at 392.

This call went unheeded. Twenty years later, EPA has not issued any guidance nor initiated any rulemaking on what it would accept as appropriate uses of the defense. To the contrary, EPA concluded that it could best compel PRPs to comply with UAOs if PRPs believed EPA would pursue penalties and treble damages for any violation of a UAO. SUF ¶¶ 135-138. EPA trains Superfund attorneys to tell PRPs that they would "be taking a big risk" if they were to elect not to comply with a UAO based upon a sufficient cause defense. SUF ¶ 139. EPA reemphasized this warning in one of the few cases in which it actually brought a UAO enforcement action, arguing that PRPs who elect not to comply with UAOs based upon a subjective belief that they have sufficient cause "do[] so at their own peril." SUF ¶ 140. And EPA has further acted to limit PRPs' ability to rely on the sufficient cause defense by positing that any sufficient cause defense not asserted in a PRP's initial notice letter in response to a UAO will be deemed waived. SUF ¶ 142. EPA's pattern and practice is aimed at persuading PRPs that the "sufficient cause" defense does not provide any safe harbor. *Cf. Pearson v. Shalala*, 164 F.3d 650, 660 (D.C. Cir. 1999) (finding due process violation given FDA failure to provide

guidance on meaning of "safe harbor" provision in labeling requirements for dietary supplements; "It simply will not do for a government agency to declare – without explanation – that a proposed course of private action is not approved. … To refuse to define the criteria it is applying is equivalent to simply saying no without explanation.").

The "sufficient cause" defense is constitutionally inadequate for a separate reason:  PRPs must also consider that any challenge to EPA's selected remedy in a UAO will be limited to the administrative record compiled by EPA.  EPA's pattern and practice in creating such records prevents a PRP from having any confidence in its ability to assert a successful "sufficient cause" defense.  The pattern and practice – incorporated into Superfund attorney training – is to prepare the administrative record at a site in a way so as to "end up with the most minimal amount … of adverse comments."  SUF ¶ 160.  CERCLA regulations authorize EPA to withhold from the record *any* document it alone deems irrelevant to its decision.  40 C.F.R. § 300.810(b) provides: "The lead agency is not required to include documents in the administrative record file which do not form a basis for the selection of the response action."  Consequently, EPA also excludes from the administrative record, *inter alia*, documents relating to internal EPA deliberation and debate over remedy selection, the documents perhaps most likely to support a PRP's argument that the selected remedy was arbitrary and capricious.  SUF ¶¶ 161, 162.  *See also* McAlister Decl. at ¶¶ 77, 94; Baker Decl. at ¶¶ 30-32.

Further, as noted above, rather than "providing for informal hearings that would enable a party to better determine the validity and applicability of an EPA order prior to the time it must decide whether to comply," *Solid State*, 812 F.2d at 392, EPA has dramatically scaled back the scope of UAO conferences and adopted the explicit policy that it will not even discuss PRP questions regarding liability or remedy selection during those conferences.  SUF ¶ 145.  EPA's

Rule 30(b)(6) designee could not identify a single instance since the 1980s in which EPA agreed following issuance of a UAO that a recipient had sufficient cause not to comply.  SUF ¶ 42.  As GE's Rule 30(b)(6) witness explained, "there is no definition or guidance given by the Agency to say what the Agency would view as a sufficient cause defense, and we're left to – you know, I don't know what it means.  I just know whatever [a] PRP has ever done EPA has taken the position that that wasn't it."  Gardner Dep. at 126.

Because of EPA's pattern and practice, PRPs find themselves twenty years after *Solid State* in the very state of uncertainty over the meaning of the "sufficient cause" defense that the Eighth Circuit warned would violate the constitutional protection afforded by *Ex parte Young*.  The "sufficient cause" defense provides no safe haven and no answer for EPA to its violation of PRPs' due process rights.

C.    EPA's Pattern and Practice Deprives PRPs of any Credible Choice of Saying "No" to a UAO.

In light of EPA's pattern and practice, PRPs faced with the decision whether to comply with a UAO are, beyond any credible dispute, faced with "penalties [that] . . . are such as might well deter even the boldest and most confident."  *Okla. Operating Co. v. Love*, 252 U.S. 331, 336-37 (1920).  The D.C. Circuit has long recognized that a party facing the possibility of Draconian penalties has no real choice, and that the mere risk of such astronomical liability warrants extraordinary judicial relief.  In *United States v. Philip Morris Inc.,* 314 F.3d 612 (D.C. Cir. 2003), for example, the court of appeals granted a stay of a district court order pending appeal because "[sanctions] may be of such severity that a reasonable party would not risk incurring them, even in order to preserve a clearly meritorious privilege claim."  *Id.* at 620; *see also Ark. Power & Light Co. v. Fed. Power Comm'n*, 156 F.2d 821, 832 (D.C. Cir. 1946 (it is impermissible to require a person "who is uncertain as to his legal status to gamble for stakes in

the form of substantial penalties should his guess be wrong"), *rev'd on other grounds,* 330 U.S. 802 (1947).  PRPs cannot be required to "bet the farm" to test the validity of UAOs. *Medimmune, Inc.*, 127 S. Ct. at 772.  As exercised by EPA, the CERCLA Section 106 penalty scheme "does not satisfy the constitutional requirements," *Love*, 252 U.S. at 337, and it cannot stand.

EPA's pattern and practice also renders the CERCLA scheme unconstitutional for an independent reason: it imposes substantial penalties on PRPs who seek to assert their rights in court.  The ability to petition the judiciary for the redress of grievances is one of "the most precious of the liberties safeguarded by the Bill of Rights."  *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002).  But the issuance of a UAO impermissibly burdens a PRP's choice to assert its constitutional right to judicial review.  The price of a PRP's saying "no" to EPA is the risk of astronomical penalties, coupled with no assurance of protection via the "sufficient cause" defense.  The price imposed by the UAO, therefore, represents an unconstitutional burden on a PRP's fundamental rights.  *E.g., Chicago & N.W. Ry. v. Nye-Schneider-Fowler Co*., 260 U.S. 35, 46- 48 (1922.

## CONCLUSION

Discovery in this case has shone a harsh light on EPA pattern and practice in its exercise of its UAO authority and has exposed the fallacy of the arguments EPA has made under cover of an empty record in other due process challenges to CERCLA Section 106.  There is a sharp contrast between EPA's legal arguments and its actual practice.  Under both the *Mathews* two-step test and the *Ex parte Young* coercion analysis, EPA's pattern and practice violates the due process rights of PRPs.  GE's motion for summary judgment should be granted.

December 7, 2007                              Respectfully submitted


                                             _____

Brackett B. Denniston, III                   Donald W. Fowler (Bar No. 381172)
Thomas H. Hill                               Eric G. Lasker (Bar No. 430180)
Jonathan M. Goodman                          SPRIGGS & HOLLINGSWORTH
GENERAL ELECTRIC COMPANY                      1350 I Street, Ninth Floor
3135 Easton Turnpike                          Washington, DC  20005-3305
Fairfield, CT  06431                         (202) 898-5800
(203) 373-2492

Carter G. Phillips (Bar No. 264176)          Laurence H. Tribe
Angus Macbeth (Bar No. 353953)               420 Hauser Hall
SIDLEY AUSTIN LLP                            1575 Massachusetts Ave.
1501 K Street, N.W.                          Cambridge, MA  02138
Washington, D.C. 20005                       Voice: (617) 495-4621
Voice: (202) 736-8000
                                             COUNSEL FOR PLAINTIFF GENERAL
                                             ELECTRIC COMPANY

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December, 2007, General Electric Company's

Motion for Summary Judgment and Memorandum of Law in Support Thereof, and the

accompanying Statement of Material Facts As To Which There is No Genuine Dispute, Proposed

Order, and Notice of Bulky Exhibits were served on the following counsel of record by operation

of the Court's Electronic Case Filing System:

> Angeline Purdy
> Brian Lynk
> U.S. Department of Justice
> Environmental Defense Section
> 601 D Street, NW, Suite 8000
> Washington, DC  20004

Copies of bulky exhibits not filed electronically were served on counsel by hand.



/s/ Eric G. Lasker_____